# CLARK v. STATE.

No. A-11476. Feb. 13, 1952.

Rehearing Denied March 19, 1952.

(239 P. 2d 797.)

Rutherford H. Brett, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant, Arthur Clark, was charged in the district court of Carter county with the crime of murder; was tried; convicted of manslaughter in the first degree; and pursuant to the verdict of the jury was sentenced to serve seven years imprisonment in the State Penitentiary; and has appealed.

Two assignments of error are presented in the brief of defendant. First, the evidence was insufficient to sustain the conviction. Second, the special prosecutor was guilty of prejudicial misconduct in his cross-examination of defendant.

Doctor Eugene F. Ross testified that on April 2, 1948, he was called to the pool hall operated by Charlie McCabe in the town of Wilson, and there found the body of McCabe lying on the floor. He had been dead about ten minutes. The doctor examined the body for gunshot wounds and found four bullet wounds. His examination disclosed that the deceased had been shot in the back, and that any one of the three bullet wounds in the back would have been fatal, and that in addition he was hit by a bullet in the upper portion of the arm, next to his body, which came out in front. The doctor did not say whether the bullet wound in the arm was on the right or left arm.

C. E. Williams testified that he was in the McCable pool hall about 10:00 p.m. He was employed there and at the time the shooting occurred was at one of the tables racking balls. When the first shot was fired the witness looked up and saw Charlie McCabe standing at the south end of a Coca Cola box facing the back of the building. McCabe's back was to the defendant, Arthur Clark, who was firing a pistol at him. McCabe started running toward the back of the pool hall. Clark fired three more shots before McCabe fell to the floor. McCabe fell near the first table toward the front of the pool hall about twelve or fifteen feet from the Coca Cola box. After defendant had killed McCabe, he put his gun in his pocket and walked out of the pool hall.

Herbert Duncan testified that he was living in Wilson on April 2, 1948, but at the time of the trial was living in California. On the night Charlie McCabe was killed the witness was seated on the east side of the building in the second seat and had a clear view of all that occurred. He saw the defendant, Clark, walk in the door holding a gun in his hand. He took two or three steps in front of the door and then started shooting at Charlie McCabe. At the time the first shot was fired McCabe was leaning over the pop box. After the first shot was fired McCabe started running toward the back of the pool hall and Clark kept shooting at him until he fell. Neither Clark nor McCabe said a word. McCabe did not have anything in his hands. One of the shots fired by the defendant struck the witness in the leg.

Buster Gunter, nightwatchman, testified that on the night of April 2, 1948, Arthur Clark came to him and told him that he and the chief might be needed at the pool hall. They investigated and found Charlie McCabe was dead. They then arrested the defendant, who handed them an automatic pistol with which he said he had done the shooting.

Royce Reeser testified that he was in the pool hall the night of the killing, standing at the first table. He was acquainted with both the defendant and the deceased. He was not looking at them when the first shot was fired but he heard the first shot and turned immediately. McCabe was between the counter and first pool table running toward the back of the building, but fell over the front of the first table and died. McCabe was a much larger man than the defendant.

Charles Kenneth Ward testified that he was sitting in the shoeshine chair at the front of the pool hall at the time the fatal shooting occurred. He was not looking toward the door when the defendant entered, but looked up as the first shot was fired and saw Mr. McCabe standing over the coke box. The witness immediately dashed out the front door and did not wait to see what else occurred.

That was all of the evidence of the state.

The defendant entered a plea of self-defense. He testified about two weeks prior to the fatal altercation with McCabe he had been in a poker game

with some other individuals and had lost a considerable amount of money; that he gave them a check for $300 to take care of his losses; that the party to whom the check was given took the check to McCabe, who cashed it. The defendant in the meanwhile stopped payment of the check because he felt that the parties who had won his money in the poker game had cheated him; that McCabe came to him and demanded payment of the check and threatened to kill him unless he paid the check; that McCabe came out to his place about 2 o'clock in the morning and struck him over the head with a hard substance which defendant thought was a pistol, and took $280 out of his clothes; that while he was there McCabe fired a shot close to the defendant. McCabe was about six feet tall and weighed about 200 pounds and the witness was five feet eleven inches tall and only weighed 128 pounds; that McCabe paid a fine for fighting; that Homer McCabe, brother to Charlie McCabe, talked to him and asked him not to prosecute the case and told him that he thought he and Charlie should get together and talk things over and become friends; that he went up to Charlie's place with Homer, and Homer told Charlie that Clark had agreed not to prosecute and Charlie just nodded his head; that the defendant then left; that later in the week he walked into the pool hall of the deceased and purchased a sack of tobacco, and thought that things had been patched up between them; that later he went into the pool hall and McCabe cursed him and told him to leave or else; that Oliver Marusky told him that McCabe had threatened his life. After that he commenced to carry a gun for protection. On April 2, 1948, he went to McCabe's pool hall for the purpose of fixing up their difficulty. When he entered the building McCabe was behind the counter leaning over the counter reading a newspaper. When McCabe looked up and saw the defendant, McCabe reached below the counter with his hand. The defendant thought he was reaching for a gun and so he pulled out his gun and started firing. He shot several times. At the first shot, the left side of McCabe's body was toward him. At the other shots, McCabe was running towards the back of the pool hall. He thought McCabe had a gun in his hands, but when he threw his hands above his head and saw that he did not have a gun he stopped his shooting and left the pool hall.

The defendant introduced several witnesses who testified concerning the previous altercation had between defendant and deceased, when the deceased gave defendant a severe beating, and also as to threats made by the deceased toward the defendant. However, in determining the sufficiency of the evidence this court has many times held that if there is any competent evidence in the record from which the jury could reasonably conclude that defendant was guilty of the crime charged against him, then a motion for an instructed verdict of not guilty on account of the insufficiency of the evidence is properly overruled.

Under the evidence of the state, the killing was premeditatedly done. The deceased was unarmed and he was shot in the back. Even the shot which struck the deceased in the arm was in the back of the arm because the doctor stated that it came out in front. Irrespective of the threats that had been made by the deceased toward the defendant, at the time the killing was done it was a cowardly, dastardly, crime and fully warranted a conviction for murder.

The second assignment of error is directed at the following cross-examination of the defendant:

"Q. You said Charlie came up to your house one night about two weeks before and the light was on? A. That is right. Q. You kept the light on all the time? A. Not every night, it was a dim light. Q. That was for your customers? A. No. Q. What business were you in? A. Well, I had sold some whiskey."

It is insisted that this cross-examination was deliberately done by the special prosecutor for the purpose of degrading the defendant in the eyes of the jury,

and had the effect of proving the bad reputation of defendant when his reputation had not been placed in issue.

In the early history of this state this court had occasion to pass upon the question here presented. In the case of Slater v. United States, 1 Okla. Cr. 275, 98 P. 110, this court held that it is always permissible to inquire into the antecedents of a witness, by showing his occupation, social connections, manner of living, and such matters. In the body of the opinion it is stated:

"The presumption of law is that every person, to a large extent, has the right and power of selecting his occupation, social connections, and manner of living. Being matters largely of his own choice, they indicate his true character, and he is therefore responsible for them, and they may be inquired into for the purpose of affecting his credibility; but these reasons do not apply to indictments, arrests, or imprisonment before conviction, for the obvious reason that they are not matters of choice, but are involuntary, so far as the witness is concerned."

In the case of Fowler v. State, 8 Okla. Cr. 130, 126 P. 831, this court held that on cross-examination for the purpose of affecting the credibility of a witness, his occupation and manner of living may be inquired into. Again, in Norrid v. State, 51 Okla. Cr. 242, 1 P. 2d 417, this court held:

"On cross-examination for the purpose of affecting his credibility, the occupation, manner of living, and companions of a witness may be inquired into."

To the same effect are Hopkins v. State, 9 Okla. Cr. 104, 130 P. 1101, and Irvine v. State, 10 Okla. Cr. 4, 133 P. 259.

In 58 Am. Jur., Witnesses, § 693, it is stated that as a general rule, for the purpose of impeachment, a witness, including an accused, may be asked as to his occupation, even though this may tend to degrade him or to impair his credibility. See, also, 1 A.L.R. 1402; 70 C. J. S. § 1014.

When a defendant elects to testify in his own behalf, he occupies a double position. As a defendant, his character cannot be attacked by the state; as a witness, he puts his credibility in issue like any other witness. Henderson v. State, 59 Okla. Cr. 86, 56 P. 2d 915.

The jury alone determines the credibility which it wishes to give to each witness, but there is necessarily some discretion vested in the trial judge as to the extent of the examination which may be made of a witness for the purpose of affecting his credibility, and, unless there has been an abuse of discretion, the conduct of the trial court will be sustained. The trial court certainly should not allow cross-examination of the witness to extend into collateral matters which would cause the jury to place undue emphasis upon the collateral matters and forget the issue of the guilt or innocence which they are called upon to determine. However, it appears to us that in every case when a person is offered as a witness, whether it be the accused, or any other witness, it may be proper to inquire as to his occupation. However, being a collateral matter the examiner would be bound by the answer given by the witness and could not by rebuttal evidence seek to impeach the witness in connection with the answer that was given.

Moreover, we are convinced that whether this question by the special prosecutor was erroneous or not, it did not affect the verdict because the defendant could not overcome the case built up against him by reason of the physical facts which surrounded the shooting. The deceased was struck one time in the back of one of his arms, which wound was not fatal, and then, as he attempted to flee to escape the shooting, he was shot three more times in the middle of the back, any one of which shots would have been fatal. He was unarmed. There were

no guns in the showcase. There was nothing in the showcase for which the defendant could have been reaching to bolster the self-defense theory. The jury would have been justified to have wholly excluded any theory of self-defense because at the time the fatal shot was fired the deceased was fleeing and was making no overt act towards the defendant.

It is stated by counsel that the trial judge was eminently fair in his instructions to the jury, and in our examination of the record we have found no error of sufficient importance to justify this court in reversing the conviction.

The judgment is affirmed.

BRETT, P. J., and POWELL, J., concur.