**Olen KENNEDY and Lloyd Kennedy, Appellants,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. F–74–185.**

Court of Criminal Appeals of Oklahoma.

Nov. 7, 1974.

S. Daniel George of Green & George, Sallisaw, court appointed, for appellants.

Larry Derryberry, Atty. Gen., Kenneth L. Delashaw, Jr., Asst. Atty. Gen., Patrick Kernan, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellants, Olen Kennedy and Lloyd Kennedy, hereinafter referred to as defendants, were charged, tried and convicted in the District Court, Sequoyah County, Case No. CRF–72–187 for the offense of Murder in violation of 21 O.S.1971, § 701; their punishment was set at life imprisonment and from said judgments and sentences a timely appeal has been perfected to this Court.

At the trial, following the opening testimony of Ted Stites, the Court Clerk of Sequoyah County, stating that State's Exhibits 1–18 had been in his possession since the preliminary hearing, Dr. W. M. Wilson, Sequoyah County Medical Examiner, was qualified as an expert witness.

Dr. Wilson testified that he received a call at approximately 8:00 p. m. on December 4, 1972, to go to a scene 12 and ½ miles north of Sallisaw. Upon arriving at the scene where several law enforcement officers had already gathered, Dr. Wilson said he observed a blood-spattered area along the county road bearing fresh blood, skin tissue and skull fragments. The doctor said he gathered a portion of the fragments and tissue, placed it in a plastic bag and took it to the office of Dr. A. S. Koenig, a Ft. Smith, Arkansas forensic pathologist, who confirmed his finding that the matter was human brain tissue. In the course of the examination several pieces of lead were discovered in the matter and were introduced to the court in State's Ex-

hibit #11. Dr. Wilson further testified that on December 5th he was called to an area approximately two miles from the original scene where police officials had discovered a body in an abandoned water well. The medical examiner then identified State's Exhibit #1 as a photograph of the body found in the well of the deceased, Ted Haggard.

Earl Gene Walkup testified that on December 4th he stopped at the deceased's service station between the hours of 6:00 and 6:30 p. m. and that a person he did not recognize came out of the station and told him that they were closing. He said that at that time he observed the deceased and another man inside the business and that a white-over-green pickup, which he identified as resembling the one pictured in State's Exhibit #2, was parked outside. Mr. Walkup said he drove away from the station, but in a few minutes came back by; his suspicion aroused by the fact that the station usually did not close until 8:00 p. m.; and further aroused by the fact that the lights inside the station were out, while the outside lights were on, this being exactly opposite from the deceased's usual pattern of closing. The witness proceeded to his own place of business where he placed a call to the sheriff's office telling them of his suspicions. He further testified that later in the evening he observed a pickup truck that looked like the one he had seen at the service station, parked at Olen Kennedy's home. On cross-examination, the witness failed to identify the defendants and testified that he did not know the make of the pickup truck.

Albert Hammett, a Sequoyah County Deputy Sheriff, said he received a call at approximately 6:15 p. m. on December 4, 1972, and proceeded to Haggard's Service Station where he was joined by Deputy Leo Matlock. Deputy Matlock testified that he arrived at the station at 7:00 p. m. and upon gaining entry noticed that the cash register had been knocked askew and that there was blood on the counter and on some oil boxes nearby. He then checked a fake-front counter where the deceased usually kept his money and found it empty.

Next to testify was Ernest William Kellog who stated that he and his wife, their two year old child and a friend, had left their home in Vian at approximately 6:00 p. m. on December 4th, to take the friend, Dawson Coulston, to his home. While driving on a county backroad northwest of Sallisaw, at 6:30 or 6:45 p. m., he testified that as his pickup came across a hill he saw a Chevrolet pickup truck with its lights on, parked ahead in the roadway. He saw some men scuffling, and then noticing that one of the men was holding a shotgun, which he identified as State's Exhibit #8, he tried to turn around in the roadway. Unable to accomplish this, he testified that he drove forward, noticing a wine bottle, which he identified as State's Exhibit #18, laying beside the open right-door of the stopped pickup. Just as he drew almost even with the stopped vehicle, an old man, whom he identified as the deceased, ran in front of his truck, causing him to stop. He testified that the man then ran to the driver's side of his vehicle, opened the door and grabbed the steering wheel begging for help, saying, "They are going to kill me, please help." Kellog said his pickup was rolling a little and as the bloody old man held on to him, the defendants ran up and while a man he identified as Olen Kennedy held a shotgun, the man he identified as Lloyd Kennedy, repeatedly struck the deceased, finally breaking his thumb to remove his hand from the steering wheel in order to pry him from the vehicle. The witness said that as soon as the defendants jerked the deceased from the pickup, he sped away leaving them in the road.

Witness Kellog said that he went immediately to the community of Dwight Mission where he called the sheriff and told him what he had just seen. After that, he returned with the law officers and saw the blood and skull fragments in a ditch at the scene, along with items he identified at trial which were found within a few feet

of the death scene. These items included a pocket knife, introduced as State's Exhibit # 3, a tire gauge (Exhibit # 4), some Ford keys (Exhibit # 5) and a brown cap (Exhibit # 13).

Witness Shirley Deen Kellog testified to substantially the same facts as did her husband, and identified Exhibit # 1, a photograph of the deceased, as the man who had come to their pickup for help; Exhibit # 2 as resembling the pickup at the scene; and Exhibit # 18 as the wine bottle which was laying in the road close to the pickup. In addition, she stated that as they left the scene she looked back through the rear window of their truck and saw the old man being pushed toward a ditch beside the road. She stated that this was the same ditch where the blood was discovered when they returned. On cross-examination, Mrs. Kellog admitted that she was presently charged with two felonies in Sequoyah County that had not yet come to trial.

In relation to the State's Exhibit # 2, Ronald Welsandt, a news photographer for the Sequoyah County Times, testified that he took the photograph in the exhibit on December 7, 1972, at 1:00 p. m.

James B. Hisley, a trooper with the Oklahoma Highway Patrol, testified that he was working with Trooper Keith Buchanan on the night of December 4th when they met Ernest Kellog at approximately 7:15 p. m. and went with him to the scene of the alleged crime. On the west side of the road they found a leather cap, and looking on the other side of the road they found what appeared to be blood and skull fragments. Within a few feet of the blood, he testified that they saw the pocket knife, tire gauge, car keys and wine bottle, all of which he marked at the scene, showing the identification marks to the court. Officer Hisley further testified that at approximately 8:00 p. m. he stopped the defendants, whom he identified at trial, as they drove near the scene of the crime.

Deputy Sheriff Ben Callahan testified that he met the Highway Patrol troopers at the scene of the incident at 7:30 p. m.

and that at approximately 8:00 p. m. he saw a truck resembling the one they were on the lookout for, driving near the scene. He said he stopped the white-over-green late model pickup truck and asked the driver, Lloyd Kennedy, to get out. When he opened the door he saw a shotgun laying in the floorboard and in response to his questions about it, Olen Kennedy said that the gun was his and that it was unloaded. Deputy Callahan said he picked up the gun and looked in the chamber seeing that it was loaded. At trial he identified State's Exhibit # 9 as the shell he took from the gun. The witness said that Troopers Hisley and Buchanan then asked the defendants and Olen Kennedy's wife Sue, to get into Deputy Callahan's car. Callahan said the highway patrolmen then left for Marble City to meet Dr. Wilson and the District Attorney to bring them to the scene, while he sat in the car with the defendants. After a short time lapse, Olen Kennedy asked how long they were going to be detained, then both men asked to get out of the car to relieve themselves. Once outside, Olen asked again how long it was going to take, and Deputy Callahan said that he did not think it would be very long. At page 365 of the Transcript, Deputy Callahan testified as follows:

"He said, Olen Kennedy told me he was going on home. If we wanted him we know where he lived. So they got in the pickup and drove off, Olen and Lloyd and Sue Kennedy.

Q. Did they make any other statement to you?

A. He told me, Olen Kennedy said if they took him in that night we would have to shoot him."

After the defendants left, and Dr. Wilson examined the remains, Deputy Callahan said the officers decided to go arrest the defendants and that Lloyd Kennedy was taken into custody that same night at approximately 10:00 p. m. and Olen Kennedy, who lived two and one-half miles from the murder scene, was arrested the next morning at 7:00 o'clock. At approxi-

mately 7:30 a. m. on December 5th, he said he was returning to the scene of the incident, making stops in between Olen Kennedy's house and the killing spot, searching for possible hiding places for the body, when he noticed fresh tire tracks coming from an abandoned homesite. He stopped at the burned-out house, located three-fourths of a mile from the Kennedy's and noticed that rocks and dirt around the well had been disturbed. Callahan said that in a search of the area he found a pair of broken eye glasses, which were introduced as Exhibit # 6.

In further testimony, the deputy said that on December 21st, he returned to the murder site with Dr. Wilson and Bill Martin, the operator of two metal detector machines. He stated that directly beneath the blood-stained earth where the skull fragments had been found, they found three lead pellets buried one or two inches underground. These pellets he then identified as having been labeled as State's Exhibit # 12.

In recall testimony, Officer James Hisley testified that when the defendants' pickup first drove up to the scene, he observed blood and water in both the floorboard of the cab and in the bed of the truck.

Testifying to substantially the same facts concerning the appearance of the abandoned homestead well, was Highway Patrolman John Davis, who added, on cross-examination, that plaster casts had been made of the tire tracks leading from the scene, revealing the tires to have been mud-grip type tires.

Sequoyah Civil Defense Director Bob Darnell testified that he was called to the homestead site on December 5th with pumping equipment to pump out a water well. He pumped down to 20–25 feet of water when he first saw a bare foot exposed. Before the body could be recovered, Darnell testified that a large rock, which he estimated as weighing 200 pounds, had to be removed from the well. After that was done, he secured the other foot of the victim and brought him to the surface where the picture, identified in State's Exhibit # 1, of the deceased was taken. On cross-examination, Darnell added that there had been two to three inches of rocks piled around the top of the well which were removed before the pumping began.

Brenda Haggard, daughter-in-law of the deceased, identified exhibits of the tire gauge, glasses, glasses earpiece, cap and cap liner all as having belonged to the deceased. Rex Haggard, the deceased's son, described three places his father usually used to hide money in his service station. He testified that on December 4, 1972, between 7:00 and 7:30 p. m., he went to the station, searched the hiding places, and that there was no money. He also identified his father's pocket knife.

Oklahoma Bureau of Investigation Agent Jack Lay testified that he and Agent Jerry Sunderland were assigned to investigate the Ted Haggard case. He said that on December 5th, when observing the murder scene, he discovered the earpiece from a pair of eyeglasses. He said he also took the auto keys found at the death site and used them to start a Ford pickup belonging to the deceased.

Ray Lambert, a firearms examiner for the Bureau of Investigation, stated that he examined the 12 gauge shotgun and the shell found in it belonging to the defendants, and ascertained that the shell contained "ought shot pellets." He further testified that the pellets introduced in State's Exhibits 11 and 12 were "ought buck."

William J. Cavney, a forensic chemist who examined the shotgun on December 28th, testified that he found human blood stains about a quarter of an inch in diameter in the area of the pump and also found another blood stain which he determined not to be human in origin. On cross-examination, the chemist explained that the human blood stain was newer than the animal stain because it was lighter in color. He added that he did not try to type the

human blood. In further testimony, Cavney explained that three different hair samples taken from the deceased after death, at the scene and from his cap and introduced into evidence as State's Exhibits # 13, # 16, and # 17, all contained a mixture of gray and brown hair bearing similar characteristics.

Opening for the defense was Bob Howard, the program director for Channel 8 in Tulsa, who testified that "Dragnet" came on at 6:30 on December 4, 1972.

Thirteen year old Dale Henning next testified that on December 4th, while he was doing his homework and watching "Dragnet" the defendants came by his house, ten miles north of Sallisaw to visit his parents. Young Henning said his folks were not at home, so the defendants played with him and his brothers and sisters for a few minutes and left. On cross-examination the witness admitted that the defendants were his relatives.

Robert Henning, father of witness Dale Henning, testified that he and his wife left their home around 4:00 p. m. on December 4th, not returning until a little after 7:00 p. m., after the defendants had been at his house. On cross-examination, the witness admitted that he was related to the defendants and also had a previous felony conviction.

Next to testify was Laverne Dora Pavlick and her husband George Pavlick, who testified to substantially the same facts as his wife. Mrs. Pavlick testified that for several years she had lived next door to the Lloyd Kennedy's at Vian. She said that on Monday, December 4th, as she was leaving her house a little before 7:00 p. m., she and her husband spoke to the defendant as he was feeding his dogs in his backyard. She testified that she knew the time positively because she and her husband have a standing engagement to play dominoes every Monday at 7:00 p. m., and that they were on their way when the conversation took place. She said that Lloyd Kennedy warned her husband that they were going to have a heavy frost that night,

and that they had talked about his child who had been ill.

Albert Whitmire, brother-in-law of the defendants, testified to some mileage figures and time spans to drive from different spots allegedly involved in the incident. He testified that from the Henning house to Ted Haggard's service station, it took 15½ minutes driving at 55 miles per hour; from the Henning house to the death scene the driving time was 24 minutes, and from the death scene to Vian was 22 minutes.

John Russell, an Assistant District Attorney in Sequoyah County, testified that he had not shown the Kellog witnesses any pictures of the defendants prior to a lineup, but that he had refreshed their memories with pictures in February, prior to the Preliminary Hearing.

Another Assistant District Attorney, Wesley Bennett, testified that to his knowledge no fingerprints were analyzed from Exhibit # 18 (the wine bottle found at the murder scene).

Dr. W. M. Wilson, when called by the defendants, testified that the victims of a homicide are usually blood-typed and that Ted Haggard was blood-typed. He also testified that it would be possible to type dried blood, but admitted, on cross-examination, that it would have been very difficult to type a small quantity of dried blood.

Dawson Coulston testified that he left the Kellog house at approximately 6:00 or 6:30 p. m. on December 4th, with the Kellogs who were going to take him home. He stated that as they came around a curve they saw some men in the roadway ahead and that when he saw one of them holding a shotgun, he tried to crawl under the dashboard. When the deceased opened the pickup door, Coulston said he got out from under the dash, but he added that all he saw was the old man's hand and "the blue jacket guy started pulling him out." He testified that all he could describe was a blue quilted jacket and the fact that it was a green pickup parked in the roadway with a wine bottle laying beside it. The witness said he got a glimpse of the people

involved in the incident, but he could not identify them.

Testifying in his own behalf, Lloyd Kennedy said that on December 4th, while he was babysitting with his children while his wife attended college classes, his brother Olen had come by and asked him to go to Tahlequah to seek work. The defendant said he took his children and left the house at approximately 10:30 a. m., returning the children home at 2:30 p. m. to stay with their mother. After that, the two brothers allegedly drove south of Vian, stopping to talk at a service station and to drink a few beers. They then decided to drive to Stilwell and on their return trip they stopped at the Henning house where they drank a beer and played with the children. Returning to Lloyd's house at approximately 7:00 p. m., the defendant said he went outside and fed his dogs, visited with his wife for 10 to 15 minutes, and then left his house to go to Olen's house where they were going to go deer hunting.

Lloyd Kennedy said that after they arrived at Olen's at approximately 7:30 or 7:45 p. m., before leaving to go hunting, they decided to take Olen's wife Sue to buy some cigarettes. According to the defendant, the three were on the way to Marble City for the cigarettes when they were stopped by the roadblock. In explaining the fact that there was only one gun in the truck, Lloyd Kennedy stated that they always used only one gun when night hunting because one person had to hold a spotlight while the other shot. He also explained that on the night before the incident, they had gone poaching and shot four deer, which they had hauled in Olen's pickup.

When they were stopped at the roadblock, Lloyd testified that Ben Callahan ordered them out of the truck and handcuffed him, but did not handcuff Olen. Lloyd said there was no mention of being under arrest and that the officers did not explain what they were being detained for other than that a man named "Felix Rob-

inson" was missing. Lloyd said they had sat in the sheriff's car for almost 30 minutes when he and his brother asked to get out. Once outside the car, Lloyd stated that he told Deputy Callahan, "You know where I live. I'm going on home." He further testified that he did not know the deceased, had not seen him on December 4th, did not kill him nor witness his brother kill him. On cross-examination Lloyd admitted three former felony convictions. He also said that he returned home by 8:00 p. m., after having been detained at the roadblock.

The final witness was Margaret Kennedy, wife of defendant Lloyd Kennedy, who substantiated the version of the happenings occurring on December 4th, as testified to by her husband.

■ In his first proposition of error, the defendants contend that the court erred in allowing the witnesses Ernest and Shirley Kellog to identify the defendants in court, because that identification was tainted by an illegal pre-trial lineup.

In reviewing the record, we note that the witnesses testified that their identification was based upon their observations of the defendants at the time of the commission of the crime.

Witness Ernest Kellog, when questioned about the basis of his identification, testified as follows:

"Q. (By Mr. Russell) On what do you base your identification of these defendants?

A. On that night what I seen.

Q. And nothing else?

A. Nothing else that I will ever forget."

[Tr. 274]

In her testimony, witness Shirley Kellog identified only one of the defendants, also from her memory of the incident. The record reveals the following:

"Q. Do you know the defendants Olen and Lloyd Kennedy?

A. No.

Q. Well, you don't. I take from your answer you are not personally acquainted with them?

A No, sir.

Q. Can you identify either one of them?

A. Yes, sir, one of them.

Q. Would you identify one of them?

A. Yes, sir. Now?

Q. Yes.

A. This one on the end (Indicating).

Q. Now, did you have occasion to see him there that night?

A. Yes, sir.

Q. Can you identify the other person?

A. No, sir. [Tr. 298–299]

\*  \*  \*  \*  \*  \*

Q. (By Mr. Russell) Who was it you saw there that night beating up on that old man in the ditch?

A. This guy on the end over here." [Tr. 300]

It is the opinion of this Court that in spite of the fact that the witnesses testified that prior to the lineup they were shown some photographs of the defendants by someone from the State Crime Bureau, the record does not indicate that the courtroom identification was prejudicially tainted by the lineup. A similar situation was dealt with in Wilcox v. State, Okl.Cr., 507 P.2d 580 (1973), wherein, although the witnesses had been shown photographs of the defendant prior to the lineup, it was found that since the witnesses had had an opportunity to be in the presence of the defendant and to observe the alleged crime, the identification came from a source independent from the lineup.

We also find, upon a review of the record, that the defendants failed to comply with Davis v. State, Okl.Cr., 467 P.2d 521, in that a timely objection was not made to the introduction of the identification of the defendants at trial and because no request for an evidentiary hearing, outside the presence of the jury, was made. Thus, we find that the issue was not properly preserved for review on appeal, and under the facts and circumstances of this case, does not constitute fundamental error. Accordingly, we find that this proposition of error is without merit.

In his second proposition, defendants urge that the trial court erred in denying defendants the right to cross-examine witness Shirley Kellog as to the exact nature of the charges pending against her in Sequoyah County at the time of the trial.

The record reveals that on cross-examination the witness admitted that she was presently charged with two separate felonies in Sequoyah County; that there had been a mistrial in the matter; and that a term of court had passed since that time with the case not having been called. The defendants contend that in addition, it was material for impeachment purposes, to be able to question the witness on the nature of the charges.

While we have consistently held that a witness may be cross-examined as to any matter tending to show bias or prejudice or circumstances under which he has a temptation to swear falsely, we find that the cross-examination of Mrs. Kellog was sufficient to show any special interest or to possibly affect her credibility. This Court, in Clark v. State, 95 Okl.Cr. 119, 239 P.2d 797 (1952), in considering the scope of cross-examination, held:

"The jury alone determines the credibility which it wishes to give to each witness, but there is necessarily some discretion vested in the trial judge as to the extent of the examination which may be made of a witness for the purpose of affecting his credibility, and, unless there has been an abuse of discretion, the conduct of the trial court will be sustained. The trial court certainly should not allow cross-examination of the witness to extend into collateral matters which would cause the jury to place undue emphasis upon the collateral matters and

forget the issue of the guilt or innocence which they are called upon to determine. . . ."

We observe that the trial court did not err in refusing to allow the defendant to attempt to inject undue prejudice on the witness' testimony by delving into the nature of the charge. We further observe that the very issue defendants so forcefully complain of is moot in view of the question: "Mrs. Kellog, are you charged with cattle theft in this county?" [Tr. 331], which, although it was objected to, and although the trial court sustained the objection, certainly allowed the jury a strong intimation of the nature of the charge.

█ It is next contended that the trial court erred in admitting the testimony of State's witness, Shirley Kellog and refusing to grant a mistrial after admitting the same, when the testimony of said witness disclosed that she had been promised "protection to keep from getting killed" in exchange for her testimony. We find, in reviewing the record, that the response was not elicited by the State as an "evidentiary harpoon" as contended by the defense, but rather was an answer to a question designed to establish that no prosecutive arrangements had been entered into by the parties.

In finding that prejudicial error did not occur in the instant case, we refer to Gonzales v. State, Okl.Cr., 388 P.2d 312 (1964), in which this Court held:

"It has repeatedly been held that before this Court can reverse a conviction upon the ground that the trial court erred in the admission or rejection of evidence, or its instructions to the jury, it must first find from an inspection of the entire record that appellant was injured thereby, and to determine the question of appellant's guilt or innocence of the offense charged. . . ."

After a careful examination of the record, we are of the opinion that no material error was committed by the court in its rulings. See also Cottrell v. State, Okl.Cr., 458 P.2d 328 (1969), in which the State's witness testified that he had been intimidated by the police to appear and testify against the defendant. In Cottrell v. State, supra, this Court held that the failure to grant a mistrial in light of the witness' admission was not error, saying, in the second paragraph of the Syllabus:

"If duress or coercion is used to obtain the testimony of a witness, this fact goes to the credibility of the witness."

We are, therefore, of the opinion that this assignment of error is without merit.

█ In a similar proposition, the defendants maintain that testimony given by Highway Patrolman James Hisley, was also prejudicial, prompted by the State as an evidentiary harpoon and that a mistrial should have been granted because of it. The complained of testimony appearing at page 379 of the trial transcript, is as follows:

"Q. Did you see anything unusual?

A. Yes, sir. There was blood in the pickup and water where they tried to wash the pickup out.

MR. GREEN: Object to that form of the answer and also calls for conclusion.

THE COURT: You are sustained insofar as they tried to do something. We will proceed.

MR. GREEN: Would and object to the answer of the witness further in the fact that it calls for conclusion and is not an expert nor has he been qualified.

THE COURT: Your objection is being entertained, and that portion of the testimony or response that they had tried to do something is sustained. We will proceed.

Q. (By Mr. Russell) Did you examine the bed of the pickup, Trooper Hisley?

A. Yes, sir, I did.

Q. Was there anything unusual about it?

A. Yes, sir. There was blood in the pickup and water where it had been tried to wash out.

THE COURT: Mr. Witness, there was an objection interposed and we are making minutes and every utterance is being recorded and Court sustained an objection to your conclusion where somebody tried to wash out in that portion of it only. We will proceed."

As a careful reading of the record reveals, objection to the conclusionary comments in the testimony was sustained. No Motion was made by the defendants for a mistrial to be declared in response to the answer. In Tilford v. Page, D.C., 307 F.Supp. 781 (1969), an Oklahoma case, it was held that although errors in the admission of evidence can generally be cured by an admonition, that any objection to the same was waived by failing to ask for an admonition or a mistrial. Considering that the objection to the conclusionary responses to the witness was sustained, and in view of the fact that no Motion for a Mistrial was made by the defendants, we find this proposition to be without merit.

In his final proposition, the defendants urge that the court erred in failing to sustain his Motion for a new trial based on newly discovered evidence. The evidence on which they base this contention involves the dismissal of the two felony charges which were pending against witness Shirley Kellog during the time she testified for the State in the Kennedy trial. Defendants allege that a deal was made by the prosecutor whereby, in exchange for favorable testimony from the Kellogs, charges would be dropped, and therefore the jury should have been apprised of this alleged agreement.

Nowhere, however, do the defendants provide actual proof to support this allegation beyond the fact that in March, 1974, after a mistrial in November, 1971 on the cause, the charges against Mrs. Kellog, brought originally in June, 1971, were dropped with the District Attorney's approval, after Mrs. Kellog's attorney filed a Motion to Dismiss.

Defendants relies primarily on Giglio v. U. S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), in which a new trial was granted when it was discovered that a deal had been made prior to trial between an unindicted co-conspirator and an Assistant U.S. Attorney that in exchange for the witness' testimony he himself might not be charged.

Clearly, the facts in that decision and in the instant case are not analogous. Moreover, most importantly, in the *Giglio* case, the United States Attorney involved in the negotiations, filed an affidavit admitting that a deal had been made. We do not find any such fact in the instant case. Further, it should be noted that in the *Giglio* case, the court stated that in that case the "Goverment's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury." In the instant case, this clearly was not the situation in view of the strong circumstantial evidence existing separately from the witness' testimony.

We have repeatedly held that it is not error to overrule the Motion for New Trial when the only new evidence sought to be introduced would be to impeach a State's witness. In Jones v. State, Okl.Cr., 499 P.2d 932, we cited the third and fourth paragraphs of the Syllabus of Ward v. State, Okl.Cr., 444 P.2d 255, cert. denied, 393 U.S. 1040, 89 S.Ct. 665, 21 L.Ed.2d 588, wherein we stated:

"A motion for new trial upon the ground of newly discovered evidence is not sufficient where it only tends to discredit or impeach the witness for the State and especially where it would not change the result of the trial.

"The granting of a new trial on the ground of newly discovered testimony is a matter largely within the trial court's discretion and is not to be exercised except where there is reasonable probability that, if such evidence had been intro-

duced, different results would have been reached."

Accordingly, in view of the fact that there was ample testimony at trial setting forth that Mrs. Kellog was currently charged with two felonies in Sequoyah County, thus making the credibility of her testimony a matter for jury determination, and in view of the strong circumstantial evidence, and for all the reasons above set forth, we find defendants' final proposition to be without merit.

In conclusion, we observe that the record is free of any error which would cause modification or .reversal. The judgments and sentences are accordingly affirmed.

BRETT, J., and DONALD E. POWERS, Assigned Judge, concur.