Charles Troy COLEMAN, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–80–150.

Court of Criminal Appeals of Oklahoma.

Sept. 23, 1983.

Patti Palmer, Deputy Appellate Public Defender, Norman, for appellant.

Jan Eric Cartwright, Atty. Gen., Robert C. Smith, Jr., Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

BRETT, Judge:

Appellant, Charles Troy Coleman, was charged, tried, and convicted of Murder in the First Degree in Tulsa County District Court, Case No. CRF–79–2176. The jury assessed the death penalty as punishment pursuant to 21 O.S.1981, § 701.10.

The evidence presented by the State to convict appellant for the death of Russell Lewis was almost entirely circumstantial except for very damaging testimony given by a former cellmate of appellant's. Eli Maghe was being held in the Tulsa County jail when appellant was there pending trial in the present case. Maghe testified that while the two of them were in jail, appellant confessed to killing a man near Chandler Park in Tulsa after robbing him. Appellant told Maghe that he shot the man using a revolver which he had taken from a

police officer, and which he subsequently discarded in Arizona.

The remaining evidence at trial is best understood when stated chronologically.

On April 24, 1979, a police officer in Luther, Oklahoma, stopped a car driven by appellant for speeding. Following a driver's license check, appellant overpowered the officer, slashed his throat, and took his revolver. Appellant left the officer handcuffed and locked in the backseat of his patrol car.

Two days later, Russell Lewis, the murder victim, who was temporarily residing in Tulsa, was paid by his employer. On the night of April 26, he had stopped for a beer at a club he frequented, and left around 8:30 p.m. He was not seen alive again.

On April 28, 1979, an employee of the Frisco Railroad in Tulsa found Mr. Lewis' body down an embankment near Chandler Park and reported the discovery to the sheriff's office. A search of the victim's clothes produced no billfold or money. Evidence showed that Mr. Lewis died from a single gunshot wound to the head.

On that same day, Officer Parrish of the Pima County, Arizona, Sheriff's office stopped appellant in Arizona for driving erratically. Appellant was driving a pickup truck that he claimed belonged to his father, Mr. Lewis. Appellant pulled a gun on Officer Parrish, took his gun, and then drove the officer's car into the desert and left him locked inside. Within minutes, other officers were in pursuit of appellant and apprehended him. Appellant was driving the victim's pickup truck and possessed keys that fit door locks at the victim's home. A Turner Turnpike ticket stub found in the truck placed appellant entering the turnpike at the Bristow, Oklahoma, entrance on April 27 at 12:42 a.m., several hours after the victim was last seen alive, and exiting in Oklahoma City at 3:34 a.m. the same morning.

Nearly three months later, the Luther, Oklahoma, officer's gun was discovered in the Arizona desert near the point where appellant was apprehended. The man that inadvertently found the gun testified that it contained five shells and the sixth chamber was empty.

Appellant presents thirteen assignments of error in this appeal. Insofar as this conviction must be reversed, it will be necessary to discuss only those issues which will have a bearing on a new trial.

In one of his assignment's of error, appellant alleges that his right to self-representation was denied at trial and in support of this allegation cites *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Appellant did not, however, unequivocally express his desire to represent himself. He filed several motions placing certain conditions on the assertion of his right. The trial court properly conducted a hearing and determined that even though his initial request might have been timely made, the subsequent motions placing the various conditions on his request caused his expression not to be unequivocal.

In view of the fact that the issue of self-representation may arise again, the trial court is directed to *Johnson v. State,* 556 P.2d 1285 (Okl.Cr.1976), for guidance; and further, the trial court is admonished that the request to represent oneself at trial must be unequivocal.

■ In another assignment or error, appellant challenged the exclusion of prospective jurors from the jury panel who had expressed reservations about the death penalty. Our review of the voir dire is governed by the holding in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), where the Supreme Court held, "[a] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding venireman for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." A juror may be excused for cause only if he is unwilling to consider all of the penalties provided by the State law and is irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the circumstances that might emerge in the course of the

proceedings. *Id.* at 522, n. 21, 88 S.Ct. at 1777 n. 21.

■ Appellant claims that Jurors Wright and Able were excused in violation of *Witherspoon.* A review of the voir dire leads this Court to conclude that Juror Wright was properly challenged for cause when she unambigously stated that she could not impose the death penalty under any circumstances. This is in accordance with *Witherspoon,* as Wright would not consider one of the penalties—death.

■ We have determined, however, that Juror Able was improperly excused for cause. His voir dire at best reflects general objections to the death penalty or conscientious and religious scruples against its infliction.

The following voir dire of Juror Ables was conducted:

"You have heard all the questions I have asked, do you feel you could be a fair and impartial juror in the trial of this case? MR. ABEL: I guess.

"THE COURT: You say you guess—

"MR. ABEL: I'm having a little bit of moral trouble with the death penalty.

"THE COURT: Okay. I'll get to that as soon as we have talked to all of the jurors a little bit more in detail. Do you feel at this point that you could be a fair and impartial juror in the trial of this case? Is that correct? or do you feel there is something—let me ask you this question. I'll just get into it right now, and I'll ask you this. In a case where the law and evidence warrant, in a proper case, could you without doing violence to your conscience agree to a verdict imposing the death penalty?

"MR. ABEL: No.

\* \* \* \* \* \*

"I'll get to the original question I asked. In a case where the law and the evidence warrant, in a proper case, could you without doing violence to your conscience agree to a verdict imposing the death penalty?

"MR. ABEL: I really couldn't.

"THE COURT: You don't feel that you could?

"MR. ABEL: To be honest, I couldn't. (Tr. 30–31).

The following transpired during defense counsel's voir dire of Juror Abel:

"MR. EARL: If Your Honor please, we would like to ask Mr. Abel a question.

"Mr. Abel, we're not talking about this particular case, because quite obviously you don't know any of the facts of this case so far. Is it impossible for you to conceive of any situation whatsoever, regardless of how heinous it may be, that would prevent you from assessing the death penalty?

"MR. ABEL: Well, I've been taught in church that God has the only right to do this thing, put someone to death.

"MR. EARL: As an obligation, as a citizen to serve on a jury panel, if the Court were to instruct you that under certain circumstances it was appropriate to assess such a penalty, can you conceive of any such factual situation where you would be able to follow the Court's instruction and do as the Court instructed you in applying to that factual situation?

"MR. ABEL: I could, but I think it would bother my conscience.

"MR. EARL: You could follow the instructions of the Court and assess a death penalty if you thought it was appropriate in this particular situation?

"MR. ABEL: Yes, but I couldn't with a clear conscience. If it really had to be, I could.

"MR. EARL: That's the question. I would understand, and I would hope that everybody would have a question or a problem, but given the factual situation are you now telling the Court that you would assess the death penalty if the Court instructed you it was correct?

"MR. ABEL: I think I could, yeah. (Tr. 32–33).

The State relies on the initial question asked Able to support the challenge for

cause.[1]  Unfortunately, the answer to that question indicates only that the juror had conscientious objections to imposing the death penalty.  To excuse him for that reason is in direct contravention of the *Witherspoon* mandate that a juror may not be excused because of conscientious or religious scruples against the death penalty.  Juror Able made it abundantly clear that he possessed those qualms by his answer.  In fact, *Witherspoon* states in footnote 9 that "[o]bviously many jurors 'could, notwithstanding their conscientious scruples [against capital punishment], return ... [a] verdict [of death]' ...."

Subsequent voir dire questions are more indicative of Able's position.  He indicated he was not irrevocably committed before trial had begun to vote against the death penalty by his answer to defense counsel's question, "You could follow the instructions of the court and assess the death penalty if you thought it was appropriate in this particular situation?"  When Able answered, "Yes, but I couldn't with a clear conscience.  If it really had to be I could," he disclosed his ability to consider all of the penalties; it was not an unambiguous refusal to vote for the death penalty.

■   *Witherspoon* mandated the seating of a "neutral" jury and criticized the seating of a hanging jury.  The line of neutrality was crossed when the State "swept from the jury all who expressed conscientious or religious scruples against capital punishment ...."  Id. 88 S.Ct. at 1776.  Because Juror Ables was improperly excused in violation of *Witherspoon,* the subsequently imposed death penalty cannot stand.  *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).

Therefore, for the reasons stated herein it is necessary that this conviction be REVERSED and REMANDED for a new trial.

BUSSEY, P.J., and CORNISH, J., concur.

1. A similar question was a basis of reversal in *Maxwell v. Bishop,* 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970).