**Gary Alan WALKER, a/k/a Gary Alan Edwards, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–84–795.**

Court of Criminal Appeals of Oklahoma.

July 22, 1986.

Rehearing Denied Aug. 25, 1986.

Johnie O'Neal, Asst. Appellant Public Defender, Tulsa, for appellant.

Michael C. Turpen, Atty. Gen., Susan Stewart Dickerson, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

PARKS, Presiding Judge:

The appellant, Gary Alan Walker, a/k/a Gary Alan Edwards, was charged in the District Court of Tulsa County, Case No. CRF-84-2088, with the offense of Murder in the First Degree. He was convicted by a jury, and punishment was assessed at death by lethal drug injection. Judgment and sentence was imposed in accordance with the jury's verdict. We affirm.

On May 8, 1984, Pricilla Crane discovered the body of her father, Eddie Cash, dead on the livingroom floor of his Broken Arrow home. A crime scene investigation revealed several lacerations on Mr. Cash's head, and the cord to a vacuum cleaner tied tightly around his neck. A brick covered with blood was found on a coffee table near the body. An autopsy revealed that Mr. Cash died from multiple blunt force injuries to the head, and ligature strangulation. The head injuries were consistent with those which might be inflicted with a brick.

Police investigation of the crime resulted in the arrest of the appellant. Following his arrest, the appellant gave a detailed confession to the police. He stated that he had met Mr. Cash on May 6, 1984, when Mr. Cash gave him a ride to Owasso. During the trip to Owasso, the appellant decided to go to Mr. Cash's home and burglarize it. Mr. Cash had informed the appellant that he lived in Broken Arrow. After obtaining Mr. Cash's address by calling directory assistance, the appellant went to the residence. As the appellant stood on the front porch and knocked on the door to make sure no one was home, Mr. Cash pulled into his driveway. Appellant ran, fearing that Mr. Cash would call the police.

Appellant discovered a brick at the side of the residence, and returned to the front door. He knocked on the door, gained entry to the house, and killed Mr. Cash with the brick and vacuum cleaner cord. Appellant took several items from Mr. Cash's residence, including the victim's van and shoes. The van was later recovered by the Oklahoma State Bureau of Investigation. Appellant told Detective James L.R. Brown of the Tulsa Police Department that "I knew what I was doing, but I don't know why ... I know right from wrong. I don't know why I did it, but I know I did do it."

Appellant raised the insanity defense. He produced the testimony of several witnesses alleging abuse he suffered at the hands of his step-father, Otis Walker, psychological trauma resulting from the recent death of his brother, his various prior convictions, and his past record of mental illness. Dr. Thomas Goodman, a psychiatrist, concluded that, although the appellant had the ability to know right from wrong at the time of the killing, the appellant believed Mr. Cash to be his step-father, and that it was not wrong to kill him.

At the second stage of trial, the State alleged the existence of two aggravating circumstances in support of the death sentence, to wit: (1) that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution, and (2) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1981, § 701.-12(5) and (7). The State produced evidence that, at the time of this homicide, the appellant had committed three other murders. It also produced a statement by the appellant that he would kill again. The jury found only the second aggravating circumstance, but assessed the death penalty.

## PRE-TRIAL ISSUES

### I.

In his first assignment of error, the appellant maintains that the trial court erred in refusing to grant his motion for a

change of venue. This ruling, according to the appellant, resulted in him being denied the due process of law, inasmuch as he was thereby deprived of his right to a fair and impartial jury.

The facts relating to this issue reveal that on November 5, 1984, the appellant filed his motion for a change of venue from Tulsa County. Attached to the motion were five (5) affidavits. These affidavits expressed the belief that the appellant could not recieve a fair trial in Tulsa, due to the amount of newspaper articles and T.V. broadcasts regarding the appellant and his alleged crimes. The trial court refused to rule on the motion until after the completion of *voir dire* examination, and defense counsel concurred in that decision. After the jury was selected, the trial court overruled the motion, and the case proceeded to trial.

In answering this allegation, the State first asserts that the motion was not presented to the trial court in the proper form, and, therefore, the allegation has been waived. We disagree.

Title 22 O.S.1981, § 561 states:

Any criminal cause pending in the district court may, at any time before the trial is begun, on the application of the defendant be removed from the county in which it is pending to some other county in said judicial district, whenever it shall appear in the manner hereinafter provided, that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein. Such order of removal may be made on the application of the defendant by petition, setting forth the facts, verified by affidavit, if reasonable notice of the application be given to the district attorney and the truth of the allegations in such petition be supported by the affidavits of at least three credible persons, who reside in said county. The district attorney may introduce counter affidavits to show that the persons making affidavits in support of the application are not credible persons and that the

change is not necessary, and may examine the witnesses in support of said application in open court in regard to the truth of said application; and if it be made to appear by the affidavits and examination of witnesses that a fair and impartial trial cannot be had in the county, a change shall be granted and the order made by the court. When there are several defendants in any indictment or criminal prosecution, and the cause of the removal thereof exists only as to one or more of them, the other defendants shall be tried and all proceedings had against them in the county, in which the case is pending, in all respects as if no order of removal had been made as to any defendant.

In its brief-in-chief, the State argues that none of the individuals who signed the affidavits were "credible" persons within the meaning of the statute. Regarding one of the affidavits, we agree. The affidavit in question was signed by a resident of Creek County. Section 561 clearly states that the affiants must be residents of the county in which trial is pending. However, the State's assertion about three of the other affidavits is incorrect. The State claims that these three affidavits "were executed by persons sympathetic to the defense and not qualified to serve as jurors: all affiants were criminal defense attorneys." *Brief of Appellee* at 8. We first note that section 561 does not require the affiants to be eligible for jury service; it simply requires that he or she be "credible." Second, we reject out-of-hand any suggestion that some attorney, merely by virtue of their specialties in practice, are not credible persons. Such a suggestion is an insult to the bar in general, and, in particular, to those lawyers who engage in the defense of criminal cases. We believe that the motion was properly filed and presented to the trial court in correct form.

Although we disagree with the State's contention that the affidavits were improper, we concur with the Attorney General's assertion that the mere existence

of the affidavits is not dispositive of this issue. We have "held as early as 1916, and consistently since, that the affidavits raise a question just as any other question of fact that might be submitted to the trial judge, and unless it is clear that he has abused his discretion, or committed error in his judgment, his finding and judgment will not be disturbed by this Court." *Johnson v. State*, 556 P.2d 1285, 1289 (Okl.Cr.1976). *See also Jefferson v. State*, 675 P.2d 443 (Okl.Cr.1984).

■ Turning to the merits of the appellant's due process claim, we find that it must be disallowed. The United States Supreme Court has set forth a two-part test for appellate review of alleged due process violations due to prior knowledge by jurors and pre-trial publicity. *See Murphy v. Flordia*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). First, there are cases in which prejudice will be presumed, if the fact pattern reveals "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings." [1] *Id.* at 799, 95 S.Ct. at 2035. The key to this standard appears to be the "solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob." *Id.* at 799, 95 S.Ct. at 2036. If the facts are not sufficiently egregious to give rise to the presumption, the so-called "totality of circumstances" will be examined to determine whether the defendant received a trial which was "fundamentally fair." *Id.* A review of the case should focus on the *voir dire* statements of the individual jurors, *voir dire* statistics, and the community atmosphere as reflected in the news media. *Id.* at 800–08, 95 S.Ct. at 2036–38.

■ In this case, the facts do not appear at all similar to the egregious situation which developed in the *Rideau, Estes,* and *Sheppard* cases, cited in the margin at n. 1. We refuse to apply the presumption that a due process violation occurred in this case.

Furthermore, our review of the record fails to support the suggestion that the appellant was deprived of "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). A review of the *voir dire* examination of those jurors who actually served shows that eight had heard or read something about either the appellant or this case. However, "[q]ualified jurors need not ... be totally ignorant of the facts and issues involved." *Murphy v. Florida*, 421 U.S. at 799–800, 95 S.Ct. at 2036. Only one juror had formed a pre-trial opinion about the case, but this juror stated she could put her personal opinion aside, apply the presumption of innocence, and decide the case on the law and facts. None of the jurors' comments suggested an impartiality that could not be laid aside. *Id.* Finally, the trial judge here, as he did in *Moore v. State*, 672 P.2d 1175 (Okl.Cr. 1983), "scrupulously excused those potential jurors who indicated they might not be able to set aside their knowledge or opinions of the crimes and impartially and fairly judge the appellant on the evidence presented at the trial." *Id.* at 1177.

1. Those cases in which prejudice was presumed by the Supreme Court were *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); and *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In *Murphy,* the Court discribed these cases as follows:

In *Rideau* the defendant had "confessed" under police interrogation to the murder of which he stood convicted. A 20–minute film of his confession was broadcast three times by a television station in the community where the crime and the trial took place. In reversing, the Court did not examine the *voir dire* for evidence of actual prejudice because it considered the trial under review "but a hollow formality"—the real trial had occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras.

The trial in *Estes* had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, *Sheppard* arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. *Id.* 421 U.S. at 799, 95 S.Ct. at 2035–36.

Moreover, only nine of the 57 veniremen called in this case were excused because of indications that they were influenced by media accounts of the appellant or this case. This number is substantially less than the 20 of 78 in *Murphy,* a case in which no due process violation was found, *id.* 421 U.S. at 803, 95 S.Ct. 2037, and the 268 of 430 in *Irvin v. Dowd,* which was reversed on due process grounds. 366 U.S. at 727, 81 S.Ct. at 1645.

Appellant relies most heavily in this due process claim on the fact that his alleged crimes generated extensive news coverage, as illustrated by the numerous newspaper clippings he has filed herein. However, in reviewing a due process claim of this nature, the extent of news coverage is only one factor for the appellate court to consider. Although press coverage of the appellant and his alleged crimes was extensive, this factor alone does not require a reversal. *Cf. Murphy v. Flordia, supra* (coverage of defendant's crimes "drew extensive press coverage" including "scores of articles reporting on petitioner's trials and tribulations during this period; many purportedly relate statements that petitioner or his attorney made to reporters." *Id.* 421 U.S. at 796, 95 S.Ct. at 2034. *Held:* due process not violated after a review of the totality of circumstances). Appellant also cites three cases from other jurisdictions which were reversed due to massive publicity. However, in each case, clear indications of juror prejudice were also shown. *Cf. People v. Botham,* 629 P.2d 589 (Colo.1981) (fact that 100 articles were published concerning the case, and that two-thirds of the jurors had formed a pre-trial opinion required reversal); *United States ex rel. Bloeth v. Denno,* 313 F.2d 364 (2nd Cir.), *cert. denied,* 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963) (reversal on due process grounds because of massive build-up of prejudicial publicity, and because one-half of the jurors seated had pre-trial opinions); and *Ruiz v. State,* 265 Ark. 875, 582 S.W.2d 915 (1979) (reversal required where 250 to 300 articles appeared in the press and ten of twelve jurors had a pre-trial opinion con-

cerning guilt). These cases are therefore inapplicable to the instant case.

For the above and foregoing reasons, this assignment of error is without merit.

## II.

Next, the appellant claims the trial court erred in refusing his motion for a continuance of trial, in order to allow Dr. Goodman, the defense psychiatrist, an opportunity to review medical records from the Springfield Medical Treatment Facility, which had only recently been received. The record reflects that the documents in question were received by the defense on either November 2 or 3, 1984, and trial commenced on November 5, 1984. Appellant argued below, and before this Court, that the refusal to grant the continuance denied his witness the opportunity to adequately review and thoughtfully consider these documents.

■ However, the record reflects that Dr. Goodman did not testify until November 9, 1984, giving him nearly a week to consult the records in question. Moreover, the doctor's own testimony indicated that he was able to review the records to his own satisfaction:

Q [Defense counsel] Now, is that correct, Doctor, that the last packet to which you referred, [the medical records from the Springfield Medical Treatment Facility for Federal prisoners] you did not come into possession of the complete records until last Saturday, the 3rd, is that correct?

A [Dr. Goodman] Thats right, I did not have the complete records from the Federal Penitentiary until last Saturday.

Q *Have you had time to review these and incorporate that information into any testimony you may give here today?*

A *Yes, I think I have sufficiently reviewed them to incorporate them.* [Emphasis added.]

A motion for a continuance is addressed to the sound discretion of the trial court, whose decision will not be reversed on ap-

peal unless the ruling was arbitrary and capricious. *Roberts v. State*, 634 P.2d 729 (Okl.Cr.1981). In light of the facts noted above, we cannot say reversible error occurred in this trial because of the trial court's decision.

## ISSUES RELATING TO JURY SELECTION

### III.

■ In his third assignment of error, the appellant urges that the trial court erred in refusing to grant a mistrial when a reference to probation was made during *voir dire.* The record shows that one of the potential jurors, Ms. Mitchell, stated that her husband had previously been convicted of manslaughter and had received a suspended sentence. Certainly, as appellant notes, references to probation and parole during trial should not be permitted, and have been disapproved by this Court. *E.g., Wright v. State*, 617 P.2d 1354 (Okl.Cr. 1979). However, in this case, no other reference was made to probation or parole, and we do not believe this brief, isolated and unsolicited mention of probation to be sufficiently prejudicial as to warrant reversal or modification. *See Banks v. State,* 701 P.2d 418, 424 (Okl.Cr.1985).

■ Appellant also argues in this regard that the trial court committed reversible error by referring during *voir dire* to appellate procedure. It is argued that this comment was improper under the United States Supreme Court's decision in *Caldwell v. Mississippi*, — U.S. —, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In *Caldwell,* the Supreme Court held it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer, who had been led to believe that the responsibility to determine the appropriateness of the death sentence rested with an appellate court. In the case at bar, the trial judge was merely explaining to the jury why testimony could not be read back by the court stenographer. In his explanation, the trial judge stated that the appellant courts "take a dim view of this prac-

tice.... They tend to think it places too much emphasis on a very small portion of the trial. Their general thought is if you're going to read part of it, read it all." *Caldwell v. Mississippi, id.*, is applicable in this case only if the trial judge's comments are taken totally out of context; otherwise, that holding is inapposite. This assignment of error is without merit.

### IV.

■ Appellant claims in his next assignment of error that the trial court improperly excused venireman Moore for cause. First, the appellant claims the trial court is without authority to remove a venireman for cause on its own motion. This contention is contrary to our previous holding that "if the trial court is of the opinion that any juror is not fair or impartial or is for any reason unqualified, he may excuse the juror either upon challenge of one of the parties or upon his own motion without challenge." *Lewis v. State*, 586 P.2d 81, 82 (Okl.Cr.1978). We also reject the appellant's argument that the excusal of venireman Moore was otherwise without sound basis. We have stated that the decision whether or not to excuse a potential juror rests within the sound discretion of the trial court, whose decision will not be reversed on appeal absent an abuse of that discretion. *Id.* In this case, venireman Moore told the court that his knowledge of the circumstances surrounding the case would not permit him to be completely fair and impartial. In light of this statement, we cannot say the trial court abused its discretion in excusing the venireman.

### V.

■ Appellant alleges in his sixth assignment of error that nine veniremen were excused in violation of the rule in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The Supreme Court held in *Witherspoon* that exclusion of those potential jurors who express "conscientious scruples" against the death penalty violates a defendant's right to a fair and impartial jury. *Witherspoon*

established that a venireman could be excused from jury service on a capital case only if he or she made "unmistakably clear" his or her automatic refusal to impose a death sentence or an inability to impartially judge a defendant's guilt. *Id.* at 522 n. 22, 88 S.Ct. at 1177–78 n. 22. In the years following *Witherspoon,* the Supreme Court[2] and this Court[3] applied the foregoing standard in reviewing and, in some cases, reversing convictions in capital cases. However, last Term, the Supreme Court announced that the two-pronged *Witherspoon* standard had been superceded into a single test of "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt,* 469 U.S. 412, ——, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). Although the appellant acknowledges the new standard in *Wainwright v. Witt,* he argues that it only slightly modifies the *Witherspoon* rule. *Brief of Appellant* at 24. However, it appears to us that the rule in *Wainwright v. Witt* not only eliminates the requirement that a juror would vote automatically against the death penalty before he or she may be excused, but also removes the requirement that such a view must be proved with "unmistakable clarity." *Id.* at ——, 105 S.Ct. at 852.[4] *Accord Banks v. State,* 701 P.2d 418, 423 (Okl.Cr.1985).

■ Applying the standard of *Wainwright v. Witt* to the responses of the nine veniremen in question, we find that they were not improperly removed by the trial court. Seven[5] of the nine responded that they were catagorically opposed to the imposition of the death sentence. It cannot be said that these veniremen were improperly excused under either the former or current standard.

■ In response to questions regarding the death penalty, venireman King responded as follows:

THE COURT: In a case where the law and the evidence warrant, in a proper case, could you without doing violence to your conscience agree to a verdict imposing the death penalty?

MR. KING: I'm going to have difficulty to answer that question with a yes or no. I have thought about this question for many years. Well, I don't know how many years, for a long time I've been in a lot of discussions with people about it in college. I believe I would have some difficulty with it.

THE COURT: Let me ask you this, Mr. King. If you were a juror in this case and you and your fellow jurors determined beyond a reasonable doubt that the Defendant was guilty of Murder in the First Degree, and if under the evidence and the facts and the circumstances of the case the law would permit you to consider a sentence of death, are your reservations about the death penalty such that regardless of the law or the facts or the circumstances of the case you would not inflict the death penalty?

MR. KING: I believe I would not.

THE COURT: You would not?

MR. KING: Yes.

THE COURT: I'll excuse you, Mr. King, thank you, sir. If you'll report to the jury assembly room downstairs. Thank you.

Potential juror Eberly was asked "if under the evidence and facts and circumstances of the case the law would forbid (sic) you to consider a sentence of death, are your reservations about the death penalty such that, regardless of the law or the facts or the circumstances of the case, you would not inflict the death sentence?" She replied, "I believe I could not."

---

2. *See, e.g., Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).

3. *See, e.g., Coleman v. State,* 670 P.2d 596 (Okl. Cr.1983); *White v. State,* 674 P.2d 31 (Okl.Cr. 1983).

4. The Supreme Court's rationale in retreating from the *Witherspoon* formulation is noted at 105 S.Ct. at 851–852.

5. Venireman Duncan, Growans, Miller, Mitchell, Fitch, Fennell, and Taylor.

In *Banks v. State, supra* at 423, this Court applied the *Wainwright v. Witt* test and held that a potential juror's statement, that inflicting the death sentence would "be taking a life; I don't feel like I should do that. It would be like I was taking a life too.... I guess I wouldn't [inflict the death sentence,]" made it permissible for the trial court to excuse that juror for cause. We also held that a juror who stated "I don't believe I would [be able to impose a sentence of death]" was not improperly excused. *Id.* at 422. *See also Dutton v. State,* 674 P.2d 1134 (Okl.Cr. 1984). When compared to the statements made in *Banks,* it appears that venireman King and Eberly were not improperly excused. The responses of these two veniremen are substantially similar to those made in *Banks.* This assignment of error is without merit.

## VI.

In his fifth assignment of error, the appellant contends that the removal for cause of potential jurors under the *Wainwright v. Witt* standard violated his Sixth Amendment right to an impartial jury. He argues that removal of these potential jurors from the guilt portion of this trial resulted in the denial of his right to a jury drawn from a cross-section of the community. Moreover, he claims that these so-called "death qualified" juries are more conviction prone than juries selected in non-capital cases.

This Term, the United States Supreme Court rejected this identical argument, in *Lockhart v. McCree,* —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), holding that the Constitution does not prohibit the removal for cause, prior to the guilt stage of a bifurcated capital trial, of those prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties at the sentencing stage. The Court noted that this is correct, even assuming, *arguendo,* that "death-qualified" juries are somewhat more conviction prone than "non-death-qualified" juries. *See also Foster v. State,* 714 P.2d 1031 (Okl.Cr.1986). Therefore, this assignment of error is without merit.

## VII.

Appellant's seventh assignment of error is a catch-all proposition in which he alleges miscellaneous comments and rulings by the trial court during *voir dire* were erroneous and prejudicial. We have carefully considered these arguments and find them to be without merit. The comments of the trial judge constitute reversible error only when taken out of context, as the appellant has done.

## ISSUES RELATING TO THE FIRST STAGE OF TRIAL

## VIII.

Next, the appellant alleges reversible error occurred when the trial court failed to sustain his motion for a directed verdict of acquittal made at the close of the first stage of trial testimony. Appellant claims in this assignment of error that "the State failed to rebut the Defendant's evidence of his insanity at the time of the commission of the Cash homicide." *Brief of Appellant* at 38. We disagree. The standard by which this Court will evaluate a claim such as that made herein was explained most recently in *Clark v. State,* 718 P.2d 375 (Okl.Cr.1986), in which a majority of this Court held the following:

> The M'Naghten rule is the test for insanity in Oklahoma. 21 O.S. 1981, § 152. The initial burden is on the defendant to establish a reasonable doubt as to his sanity. *Munn v. State,* 658 P.2d 482 (Okl.Cr. 1983). If the defendant establishes a reasonable doubt of his sanity, the presumption of sanity vanishes and it is incumbent upon the State to prove beyond a reasonable doubt that the defendant could distinguish between right and wrong at the time of the offense.

> \*     \*     \*     \*     \*     \*

... [I]t is well established that:

On murder prosecution, the question of insanity at the time of the commission of the crime, presents a question of fact for the sole determination of the jury, and where there is any evidence tending to support the finding it is not the province of the appellate court to weigh the same. *Nauni v. State*, 670 P.2d 126, 133 (Okl.Cr. 1983).

Moreover, this Court will not inquire into the credibility of the witnesses nor weigh conflicting testimony. *Jones v. State*, 479 P.2d 591 (Okl.Cr. 1971).

In determining the issue of insanity, the jury must consider all of the evidence presented, not merely the testimony of the expert witnesses, and the weight and credibility of expert opinion is for the jury to determine and such testimony is not conclusive even where it is uncontroverted. *Munn*, at 486. The jury must determine the weight and credibility of both expert and lay witnesses in light of the particular facts and circumstances shown in the case. *Id.*

*Id.* at 377–8.

In the instant case, the evidence presented by the State showed that the appellant calculated his arrival at the Cash residence, and that the appellant intended to burglarize the home. The murder was committed, under the State's theory, to prevent Mr. Cash from calling the police. Appellant's confession to police indicated he knew right from wrong, and that he expressed remorse over the incident. Furthermore, the appellant's own expert, Dr. Goodman, conceded the appellant's ability to distinguish right from wrong, but testified the appellant thought he was killing his step-father, Otis Walker, which the appellant did not believe was wrong.

■ After careful review of this evidence, we conclude that the State presented evidence by which any rational trier of fact could conclude that the essential elements of the crime, including the appellant's sanity at the time of the offense, had been proven beyond a reasonable doubt. *See Spuehler v. State*, 709 P.2d 202 (Okl. Cr.1985).

IX.

In his ninth, tenth and eleventh assignments of error, the appellant claims the trial court reversibly erred in failing to give certain instructions at both stages of trial. For clarity sake, we will consider those allegations relating to the first stage of trial in this section of the opinion, and the other allegations in the following section.

A.

Appellant first complains that the trial court erred in refusing his requested instructions on the lesser included offenses of second degree murder and first degree manslaughter.

■ The requested instruction on second degree murder was predicated on 21 O.S.1981, § 701.8(2), in which the appellant alleged he was committing the offense of attempted burglary in the second degree at the time of the homicide. We disagree. Under the facts of this case, the appellant was attempting to commit a burglary when Mr. Cash arrived home in his car. Appellant saw Mr. Cash and fled to the side of the house, where he waited until Mr. Cash went inside. Therefore, the appellant had abandoned his attempt to commit a second degree burglary at the time he initially fled the scene. Appellant was not entitled to an instruction on second degree murder under these facts.

■ We also reject the appellant's assertion that he was entitled to an instruction on the offense of first degree manslaughter. Instructions on lesser offenses necessarily included in the charged crime need only be given when there is evidence that tends to prove the lesser crime. *Campbell v. State*, 640 P.2d 1364 (Okl.Cr. 1982). In this case, there was no evidence tending to prove first degree manslaughter, which is defined as a homicide "perpetrated without design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon...." 21 O.S.1981, § 711(2).

Appellant claims that the severe physical trauma to the victim, as explained by the medical examiner's and defense psychiatrist's assumption "that he [defendant] must have been in a psychotic-like state" and "furious," establish heat of passion. However, mere anger does not remove the homicide from classification as murder. 21 O.S.1981, § 704. The heat of passion must render the mind incapable of forming a design to effect death before the defense of manslaughter is established. *Wood v. State,* 486 P.2d 750 (Okl.Cr.1971); and *Updike v. State,* 9 Okl.Cr. 124, 130 P. 1107 (1913). Under the psychiatrist's testimony, it is clear that the appellant entered the Cash residence with the intent to kill. The defense was that the appellant, though wanting to kill, did not realize he was killing Eddie Cash.

Accordingly, this assignment of error is without merit.

### B.

■ Appellant also asserts that the jury should have been informed of the significance of the insanity verdict, that is, of the fact that commitment might follow a finding of not guilty by reason of insanity.[6] We have previously held that such an instruction is not required. *See Nauni v. State,* 670 P.2d 126, 134 (Okl.Cr.1983). An instruction on this topic would distract the jury from the insanity issue and would invite a compromise verdict. *See Pope v. United States,* 372 F.2d 710 (8th Cir.1967); *State v. Garrett,* 391 S.W.2d 235 (Mo.1965).

### ISSUES RELATING TO THE PUNISHMENT PHASE OF TRIAL

### X.

■ Appellant makes four challenges regarding the sufficiency of instructions offered by the trial court in the second stage of trial. He first contends that the trial court erred in refusing his requested instructions regarding presumptions, the burden of proof and the standard of proof to be utilized by the jury in the second stage. However, the trial court's instructions adequately covered all of these issues, and we accordingly find this assignment of error to be without merit.

■ Next, the appellant claims the trial court erred in refusing his requested instruction on the topic of "jury nullification." "Jury nullification" is the jury's exercise of its inherent "power to bring in a verdict [of acquittal] in the teeth of both law and facts." *Horning v. District of Columbia,* 254 U.S. 135, 138, 41 S.Ct. 53, 54, 65 L.Ed. 185 (1920). In capital cases, an instruction on this issue would inform the jury of its right to return a sentence of life no matter how great the weight of evidence supporting the circumstances. However, the courts have almost uniformly held that a criminal defendant is not entitled to such an instruction. *See, e.g., United States v. Wiley,* 503 F.2d 106, 107 & n. 4 (8th Cir.1974). *But see Washington v. Watkins,* 655 F.2d 1346, 1374 n. 54 (5th Cir.1981). The rationale for this majority view is eloquently explained in *United States v. Dougherty,* 473 F.2d 1113, 1130–37 (D.C.Cir.1972). Although a trial judge may, in the exercise of his sound discretion, give such an instruction, it is not error for him to refuse the request. This assignment of error is without merit.

■ In his eleventh assignment of error the appellant claims that the trial court failed to give the jury adequate guidelines concerning their consideration of mitigating circumstances. However, we have previously held that "[s]pecific standards for the balancing of the aggravating and mitigating circumstances are not constitutionally required." *Brogie v. State,* 695 P.2d 538, 544 (Okl.Cr.1985). *Accord Cartwright v. State,* 695 P.2d 548 (Okl.Cr.1985).

■ Finally, the appellant maintains the trial court erred in refusing to instruct the jury that, if they were unable to reach a

---

6. Title 22 O.S.1981, § 1161 mandates the procedure to be followed when a jury returns a verdict of "not guilty by reason of insanity."

unanimous verdict as to punishment within a reasonable time, they would be dismissed and the judge would enter a sentence of life imprisonment. We previously considered, and rejected, this claim in *Brogie v. State, supra* at 547.

## XI.

■ In his twelfth and thirteenth assignments of error, the appellant makes two claims challenging the aggravating circumstance regarding future dangerousness of the appellant. *See* 21 O.S.1981, § 701.-12(7). First, he claims that the aggravating circumstance has been interpreted in an unconstitutional manner by this Court. We previously rejected this claim in *Liles v. State,* 702 P.2d 1025, 1031 (Okl.Cr.1985).[7] Appellant also claims that this aggravating circumstance is vague, and a jury must be informed of its meaning. However, we have stated that this aggravating circumstance is specific, not vague, and is understandable. *Id. See also Chaney v. State,* 612 P.2d 269, 279 (Okl.Cr.1980).

## XII.

■ Appellant next complains that the Bill of Particulars should have been stricken because the evidence enumerated therein consisted of other unadjudicated crimes, including several murders which the appellant allegedly committed. However, we have previously held that unadjudicated offenses linked to a defendant in a capital case may be introduced to support the claim of future dangerousness. *Johnson v. State,* 665 P.2d 815, 822–23 (Okl.Cr. 1982). We see no reason to alter this position. *See Newsted v. State,* 720 P.2d 734 (Okl.Cr.1986).

## XIII.

Next, the appellant claims he was not provided adequate notice of what evidence would be used by the State to prove its allegation of future dangerousness.

■ Appellant first claims that the State's "Notice of Intent to Offer Evidence in Support of Bill of Particulars" was defective because it "[m]erely list[ed] the other offenses in terms similar to an information." We disagree. The purpose of notice prior to trial is to allow the defendant time to present a defense or an explanation for alleged criminal misconduct. *Johnson v. State,* 665 P.2d at 823. To enforce this policy, the Legislature has mandated that "[o]nly such evidence in aggravation as the State has made known to the defendant prior to his trial shall be admissible" at sentencing. 21 O.S.1981, § 701.10. We have held that "[t]his statute, together with Okla. Const. art. II, § 20, contemplates that a defendant in a capital murder case be provided with a *summary* of the evidence intended to support the alleged aggravating circumstances, and a list of witnesses the State might call." *Green v. State,* 713 P.2d 1032, 1038 (Okl.Cr.1985) (emphasis added). When the State seeks to prove future dangerousness of a defendant through the use of other crimes evidence, we believe notice is sufficient if the other crimes are alleged in language comparable to that used in an information. *Cf. Liles v. State,* 702 P.2d at 1030. This information, taken together with the witness list required by our constitution, provides adequate notice under section 701.10 to afford a defendant the opportunity to "present a defense or an explanation for the alleged criminal conduct." *Johnson v. State, supra* at 823.

■ Appellant also voices a complaint about another item of evidence introduced to prove future dangerousness. Bobby Clark testified, over the appellant's timely objection, that the appellant stated "I know I'm going to die for what I've done, if I were free I would do it again." We agree with the appellant that this evidence was improperly admitted, inasmuch as no notice to the appellant of this evidence is contained in the record. However, 20 O.S. 1981, § 3001.1 provides:

7. The writer dissented on a different ground in *Liles v. State. See id.* at 1037 (Parks, P.J., Dissenting). The writer did not disagree with this portion of the *Liles* opinion, however.

No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or for error in any matter of pleading or procedure, unless it is the opinion of the reviewing court that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.

The record reflects that information regarding Clark's testimony was relayed to defense counsel in a conversation with the district attorney. While this conversation did not supply the written notice contemplated by section 701.10 and due process, the appellant has failed to demonstrate sufficient prejudice to require reversal of this sentence. Defense counsel's candid statement that he was previously aware of the evidence removes any prejudicial taint caused by this error. This assignment of error is without merit.

## XIV.

### MANDATORY SENTENCE REVIEW

■ Appellant also alleges that error occurred when the prosecutor engaged in misconduct at *voir dire* examination, cross-examination of the appellant, and at closing argument in both stages of trial. We disagree. Much of the alleged improper comments made in closing argument were not met with an objection by defense counsel, and, accordingly, will not be considered on appeal. *See Freeman v. State*, 681 P.2d 84 (Okl.Cr.1984). Furthermore, none of the comments or arguments were of such a fundamental nature as to demand either reversal or modification. Other conduct by the prosecutor which might be considered improper was met with an objection by the defense, which was sustained and for which the jury was admonished. This alleged error was thereby cured. *E.g., Kitchens v. State*, 513 P.2d 1300, 1304 (Okl. Cr.1973). This assignment of error is without merit.

## XV.

Finally, pursuant to 21 O.S.1981, § 701.-13(C), we are called upon to determine three issues in all capital cases filed before this Court:

1. Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

2. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in this act; and

3. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant.

*Green v. State*, 713 P.2d 1032, 1041 (Okl. Cr.1985).

### A.

We have reviewed the record for any possible influence of passion or prejudice, and find none. On the contrary, both the prosecutor and the defense should be commended for their generally ethical, yet zealous, behavior in the trial of this case.

### B.

■ We also find that the evidence was sufficient to support the one aggravating circumstance found. The evidence in this case revealed that the appellant, in a particularly calloused manner, bludgeoned an elderly man to death with a brick, and strangled him with the cord from a vacuum cleaner. *Cf. Robison v. State*, 677 P.2d 1080, 1088 (Okl.Cr.1984); and *Stafford v. State*, 669 P.2d 285, 299 (Okl.Cr.1983). Furthermore, evidence was submitted showing that this appellant committed three other murders over the same period of time, and that, if free, he "would do it again." This evidence provides ample support for the jury's finding of a probability that the appellant would commit future acts of violence constituting a continuing threat to society.

## C.

We also have compared this case to those other capital cases either affirmed[8] or modified[9] on appeal by this Court, and find the sentence herein to be proportionate.

Accordingly, for the foregoing reasons, the judgment and sentence of the trial court is AFFIRMED.

BRETT, J., specially concurs.

BUSSEY, J., concurs in results.

BRETT, Judge, specially concurring.

I agree that the judgment and sentence in this case should be affirmed. However, I am of the opinion that a proportionality review of death sentences is unnecessary. Such was our holding in *Foster v. State,* 714 P.2d 1031 (Okl.Cr.1986) and *Ross v. State,* 717 P.2d 117 (Okl.Cr.1986) which were decided subsequent to *Green v. State,* 713 P.2d 1032 (Okl.Cr.1985).

---

8. *Brewer v. State,* 718 P.2d 354 (Okl.Cr.1986); *Ross v. State,* 717 P.2d 117 (Okl.Cr.1986); *Foster v. State,* 714 P.2d 1031 (Okl.Cr.1986); *Green v. State,* 713 P.2d 1032 (Okl.Cr.1985); *Liles v. State,* 702 P.2d 1025 (Okl.Cr.1985); *Cooks v. State,* 699 P.2d 653 (Okl.Cr.1985); *Banks v. State,* 701 P.2d 418 (Okl.Cr.1985); *Cartwright v. State,* 695 P.2d 548 (Okl.Cr.1985); *Brogie v. State,* 695 P.2d 538 (Okl.Cr.1985); *Bowen v. State,* 715 P.2d 1093 (Okl.Cr.1985); *Stout v. State,* 693 P.2d 617 (Okl.Cr.1984); *Nuckols v. State,* 690 P.2d 463 (Okl.Cr.1984); *Robison v. State,* 677 P.2d 1080 (Okl.Cr.1984); *Dutton v. State,* 674 P.2d 1134 (Okl.Cr.1984); *Stafford v. State,* 669 P.2d 285 (Okl.Cr.1983); *Coleman v. State,* 668 P.2d 1126 (Okl.Cr.1983); *Stafford v. State,* 665 P.2d 1205 (Okl.Cr.1983); *Davis v. State,* 665 P.2d 1186 (Okl.Cr.1983); *Ake v. State,* 663 P.2d 1 (Okl.Cr.1983); *Parks v. State,* 651 P.2d 686 (Okl.Cr.1982); *Jones v. State,* 648 P.2d 1251 (Okl.Cr.1982); *Hays v. State,* 617 P.2d 223 (Okl.Cr.1980); and *Chaney v. State,* 612 P.2d 269 (Okl.Cr.1980), *modified* on other grounds, *sub nom., Chaney v. Brown,* 730 F.2d 1334 (10th Cir.1984).

9. *Parker v. State,* 713 P.2d 1032 (Okl.Cr.1985); *Eddings v. State,* 616 P.2d 1159 (Okl.Cr.1980); as *modified,* 688 P.2d 342 (Okl.Cr.1984); *Morgan v. State,* No. F–79–487 (Okl.Cr. Nov. 14, 1983) (Unpublished); *Johnson v. State,* 665 P.2d 815 (Okl.Cr.1982); *Glidewell v. State,* 663 P.2d 738 (Okl.Cr.1983); *Jones v. State,* 660 P.2d 634 (Okl.Cr.1983); *Driskell v. State,* 659 P.2d 343 (Okl.Cr.1983); *Boutwell v. State,* 659 P.2d 322 (Okl.Cr.1983); *Munn v. State,* 658 P.2d 482 (Okl. Cr.1983); *Odum v. State,* 651 P.2d 703 (Okl.Cr. 1982); *Burrows v. State,* 640 P.2d 533 (Okl.Cr. 1982); *Franks v. State,* 636 P.2d 361 (Okl.Cr. 1981); *Irvin v. State,* 617 P.2d 588 (Okl.Cr.1980).