The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

Carlton R. MARTINEZ, Defendant-Appellant.

No. 84CA0774.

Colorado Court of Appeals, Div. I.

Sept. 4, 1986.

Rehearing Denied Oct. 9, 1986.

Certiorari Denied (Martinez) March 23, 1987.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Clement P. Engle, Asst. Atty. Gen., Denver, for plaintiff-appellee.

David F. Vela, State Public Defender, Peggy O'Leary, Deputy State Public Defender, Denver, for defendant-appellant.

ENOCH, Chief Judge.

Defendant, Carlton R. Martinez, appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree sexual assault, second degree kidnapping, and of commission of a violent crime. We affirm.

Defendant's contention on appeal is that he was misidentified by the victim. The following facts as testified to by the victim are not at issue. In June of 1982, while she was maneuvering her car out of a parking space after visiting some friends, a man opened the driver's side of the car, put a knife to her throat, grabbed her hair, and ordered her to back into the parking space again. He demanded her money, which she gave him. Still holding the knife to her

throat, he ordered her to come with him and took her to a niche in an alley between a garage and a fence, where he sexually assaulted her.

The sexual assault lasted approximately 20 to 30 minutes. Then the man ordered the victim to dress and walked her back out of the alley and toward where her car was parked. He asked her if she had any more money, and she gave him some change from her purse. He told her he needed a color television and when she said she did not have one, he pushed the knife into her back until she bled. He walked her around the area, then told her to turn around and keep walking, which she did, eventually running back to her friends' house. She told her friends what had happened, they called the police, and she was interviewed and taken to Denver General Hospital for an examination. She was with her assailant for approximately one to one and one-half hours.

She gave the police investigator a description of her assailant: Black male, age 25, five-foot ten inches, 135 pounds, very thin build, brushed-down pants, very short hair. A few days later, she met with a police artist who made a composite drawing based on her more detailed description of the assailant's facial characteristics.

Throughout the summer and fall of 1982, she attempted to identify her attacker from hundreds of photographs shown to her by police investigators. She pointed out some photographs of men who had certain facial features which looked "similar" to those of her assailant, but she did not identify anyone as her assailant. She viewed a live lineup in September, but did not identify anyone in the lineup as her assailant. Neither the photographs nor the lineup contained defendant.

In January of 1983, a friend of the victim who had seen the composite drawing told her that in the *Rocky Mountain News* there was a photograph of a man who looked like the man in the drawing. The friend told her that the man's name was Philip Cooper and that his photograph appeared in the newspaper, along with two other photographs. The news story was about the three men, who "had been arrested for allegedly being involved in a shooting."

The victim obtained a copy of the newspaper and looked at Cooper's photograph, but determined that he was not the person who had assaulted her. In one of the other photographs, however, she recognized her assailant, whose name was listed below his photograph as Carlton Martinez. She then read the article and learned that Martinez and the third man, Robert Stinnett, were suspected of "the most brutal rape" the officers assigned to the case had ever investigated.

The next day, the victim was called in to the police station to view a photographic lineup. Before the viewing, she read admonitions on the back of the lineup photograph which stated, in part:

"THIS GROUP OF INDIVIDUALS MAY OR MAY NOT CONTAIN THE PERSON THAT COMMITTED THE [sexual assault]. THE FACT THAT YOU HAVE BEEN ASKED TO VIEW THIS LINEUP SHALL NOT CAUSE YOU TO BELIEVE THAT THE GUILTY PERSON HAS BEEN APPREHENDED. YOU DO NOT HAVE TO IDENTIFY ANYONE. IT IS JUST AS IMPORTANT TO FREE INNOCENT PERSONS FROM SUSPICION AS IT IS TO IDENTIFY THOSE THAT ARE GUILTY."

The victim positively identified defendant as her assailant. Subsequently, she viewed a live lineup and again identified defendant as her assailant.

Before trial, defendant filed motions *in limine* to suppress the victim's pre-trial identifications. He also filed a motion to dismiss or, in the alternative, suppress identification evidence, based on the prosecution's failure to preserve photographs from several lineups viewed by the victim. All motions were denied.

## I.

Defendant first argues that the trial court erred in denying his motion *in limine* to suppress the three pre-trial identifications by the victim because the pre-trial

identification procedures employed by the police were unduly suggestive. We disagree.

In *Alvarez v. People,* 653 P.2d 1127 (Colo.1982), the supreme court summarized the test for admissibility applicable where identification procedures are found to be unduly suggestive:

"[A] defendant's right to due process of law is violated by admitting into evidence the results of an unnecessarily suggestive identification procedure unless the totality of the circumstances establishes that the procedures do not result in a substantial likelihood of an irreparable misidentification despite its suggestiveness. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.2d.2d 140 (1977)."

The following factors are to be considered in evaluating the reliability of the identification, and must be weighed together against the corrupting effect of the suggestive identification itself:

"[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."

*People v. Alvarez, supra,* quoting *Manson v. Brathwaite, supra.*

The threshold question in the above test is whether the identification procedures were unnecessarily suggestive. If the court determines that the procedures were not unnecessarily suggestive, then the identification is admissible without further inquiry. If, however, the court determines that the procedures were unnecessarily suggestive, then it must reach the next level of inquiry: whether, after weighing the above factors, the identification was reliable despite its suggestiveness.

■ First, we agree with the trial court's conclusion that the the identification procedures were not unnecessarily suggestive. The victim's first identification of defendant in the *Rocky Mountain News* was fortuitous, and there was no police involvement leading to the identification. In fact, the victim testified that, before she looked at the photographs in the newspaper, she contacted the police department and an investigator told her not to look at the newspaper photographs. Thus, there were no police procedures employed at all.

■ Nor were the victim's second and third identifications, the photographic array and the live lineup, suggestive in any way. In both, the police procedures employed in presenting the lineups were free from any suggestive circumstances which might have led to a "substantial likelihood of irreparable misidentification." The victim had read the admonition, which warned her that her assailant might not be included in the lineups. Further, in both lineups, the individuals were "matched by race, approximate age, facial hair, and a number of other characteristics." *People v. Borrego,* 668 P.2d 21 (Colo.App.1983). The characteristics which defendant argues distinguishes them from the defendant were not significant enough to amount to an unfair lineup. *See People v. Walford,* 716 P.2d 137 (Colo.App.1985). And, contrary to defendant's contention, the mere fact that the victim knew or assumed that her assailant had been included in the lineup did not render the otherwise properly conducted lineup impermissibly suggestive. *See U.S. v. Person,* 478 F.2d 659 (D.C. Cir.1973).

■ Even if we were to determine that the three pre-trial procedures were unnecessarily suggestive, under the "totality of the circumstances" test above, the procedures did not result in a "substantial likelihood of an irreparable misidentification." The victim testified that she had an opportunity to view her assailant from different angles and in various sources of artificial lighting at the time of the crime. She stated that she was with him for approximately one and one-half hours, including a period of ten to twenty minutes during which time there was light on him and she stared at him face to face. Her initial description of her assailant, though brief, was accurate, and each time she identified defendant as her assailant she was certain of her identification. Also, while the identifications did not take place until some

months after the incident, the circumstances surrounding the incident and identifications negate the possibility of a misidentification. Taken together, these factors amount to a strong showing of the reliability of the victim's identification and support the trial court's conclusion that there was no substantial danger of irreparable misidentification.

Because of our conclusion above, we need not consider defendant's additional contention that the victim's in-court identification lacked an independent basis. *See People v. Gordon,* 44 Colo.App. 266, 615 P.2d 62 (1980).

## II.

■ Defendant next argues that the trial court erred in denying his motion to suppress evidence relating to the victim's identification of him from newspaper photographs because the photographs suggested to the jury that defendant was involved in other criminal activity, and their prejudicial effect outweighed their probative value. We disagree.

In response to defendant's motion, the trial court ruled that the victim could testify as to her identification of defendant from her viewing of the three photographs and that the three photographs were admissible, but any reference to the contents of the newspaper article was inadmissible. We find no abuse of discretion in the court's ruling.

The three photographs were frontal views of the three men. They did not include profile views, or show any identification number or other information used for purposes of booking suspects for other crimes, and were thus not clearly "mug shots." Moreover, even if the photographs are considered to be "mug shots," they were properly introduced because they were relevant to the issue of the identification of defendant as the assailant and were admitted only for that limited purpose. *See People v. Thatcher,* 638 P.2d 760 (Colo. 1981); *People v. Bugarin,* 181 Colo. 62, 507 P.2d 875 (1973). Such admission was proper to aid the jury in understanding the circumstances which led to the victim's first identification of defendant, and its probative value substantially outweighed its prejudicial effect. *See People v. Bugarin, supra.*

## III.

■ Defendant contends that the trial court erred in denying his tendered instructions on credibility and eyewitness identification because such instructions were necessary to inform the jury of the importance of identification, identification being the key issue in the case. We disagree.

Since a general instruction on credibility was given, it was not error to refuse a specific instruction on the credibility of eyewitnesses. *People v. Palumbo,* 192 Colo. 7, 555 P.2d 521 (1976). The applicability of this rule is not affected by defendant's claim that his theory of the case was mistaken identity. *People v. Vigil,* 718 P.2d 496 (Colo.1986).

## IV.

■ Defendant also contends that the trial court erred in denying his motion to incur costs of a polygraph examiner. We disagree.

Although evidence of polygraph results is *per se* inadmissible in a criminal trial, *People v. Anderson,* 637 P.2d 354 (Colo. 1981), defendant claims that the results would likely have been "helpful ... as assistance in plea bargaining."

At the hearing on the motion, the district attorney testified that the polygraph results would not influence him in the plea negotiations process or affect his decision as to whether or not to prosecute defendant. Thus, defendant did not establish that the services he sought were reasonably necessary, or in any way helpful to his defense. *See Brown v. District Court,* 189 Colo. 469, 541 P.2d 1248 (1975).

We have considered defendant's other contentions of error and find them to be without merit.

Judgment affirmed.

TURSI and BABCOCK, JJ., concur.