528 A.2d 502

**Djoudi DJADI**

**v.**

**STATE of Maryland**

**No. 1611, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

July 15, 1987.

Certiorari Denied Dec. 9, 1987.

224

Melissa M. Moore, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty.Gen., Baltimore, Sandra A. O'Connor, State's Atty., for Baltimore County and Alexandra N. Williams,

Asst. State's Atty., for Baltimore County, on the brief, Towson), for appellee.

Submitted before WILNER, ALPERT and ROBERT M. BELL, JJ.

WILNER, Judge.

On the evening of January 24, 1986, appellant went to the department of his former girlfriend, Teresa Whittle, and shot her four times in the head. He also caused some damage to her telephone when he pulled it off the wall. For those acts, appellant was tried, convicted, and sentenced in the Circuit Court for Baltimore County of and for attempted murder, use of a handgun in the commission of a crime of violence, and malicious destruction of property. He makes three complaints in this appeal:

"I. The trial court erred in refusing to grant appellant's requested postponement in order to obtain an independent psychiatric evaluation.

II. The trial court erred in admitting statements not authenticated as appellant's statements.

III. Appellant's sentence for malicious destruction is illegal."

We find no merit in appellant's first two complaints. The State concedes that, on the record in this case, the sentence imposed for malicious destruction of the telephone—six months in prison—exceeds the 60–day maximum authorized by Md.Code Ann. art. 27, § 111(b), and so we shall remand for resentencing on that charge.

(1) *Requested Postponement*

Appellant was charged by criminal information on March 6, 1986. On March 31, through privately retained counsel, he filed a barrage of motions, papers, and pleadings, including (1) a motion for pre-trial psychiatric evaluation to determine if he had a mental illness or retardation at the time of the offense and if he was competent to stand trial and (2) a plea that he was "insane at the time of the commission of

the alleged crime" and that he was incompetent to stand trial.[1]

Pursuant to that plea, and in accordance with the applicable provisions of the Health-General article of the Maryland Code, the court, on April 24, 1986, ordered appellant transferred to C.T. Perkins State Hospital for evaluation as to both competence to stand trial and criminal responsibility. The Report from Perkins was filed with the court on June 2, 1986; defense counsel acknowledges receiving a copy of it on June 10.

The Report records the unanimous forensic opinions of two psychiatrists and two psychologists that appellant suffered from "dysthymic disorder," but that he was both competent to stand trial and criminally responsible.[2] Their impressions from a mental status examination of appellant was that appellant's "thinking was logical and association relevant. Affect appropriate. Memory for recent and remote events not impaired except that he claims amnesia for the offense. Attention span and concentration adequate." The covering letter, signed by the Superintendent and the Clinical Director of the hospital, stated that, "[a]t the time of the alleged offense, Mr. Djadi was not suffering from a mental disorder which would have caused him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law,"

---

1. The terms "insane" and "insanity" were removed from the law in 1984. *See* 1984 Md. Laws, ch. 501; *also* Report of Governor's Task Force to Review the Defense of Insanity and, in particular, the Task Force Comment to Md. Code Ann. Health-Gen. art., § 12–101. We presume that counsel intended the plea to be one of "not criminally responsible," pursuant to Md. Code Ann. Health-Gen. art., § 12–109. We shall treat it as such.

2. Dysthymic Disorder has been characterized as "a chronic disturbance of mood involving either depressed mood or loss of interest or pleasure in all, or almost all, usual activities and pastimes, and associated symptoms, but not of sufficient severity and duration to meet the criteria for a major depressive episode (full affective syndrome)." *Diagnostic and Statistical Manual of Mental Disorders*, 3d ed., Amer. Psychiatric Assoc., 300.40.

that being the test for criminal responsibility set forth in the law (Health-Gen. art., § 12–108).

Trial was scheduled for June 26, 1986. At the very outset of the proceeding, defense counsel informed the court that his client did not think that the C.T. Perkins evaluation was "a fair representative evaluation." He gave no particular reason for that feeling but requested nonetheless that appellant "be re-evaluated at Perkins as to the issue of competence and responsibility...." [3] Noting that the four doctors (actually two psychiatrists and two psychologists) who had examined appellant were unanimous in their view, the court denied the request, whereupon counsel asked "that we be allowed to hire our own psychiatrist." Recognizing that the granting of that request would require a postponement, the court recessed to allow counsel to take his request to the County Administrative Judge (*see* Md. Rule 4–271(a)).

Before the County Administrative Judge, the State opposed any continuance, arguing that its six witnesses were present and it was ready to proceed. When asked what, if anything, counsel had done since receiving the Perkins report 16 days earlier, he responded that he "had made no arrangements to this point." In response to the court's inquiry of whether appellant had the funds to obtain a private evaluation, counsel represented that funds were available from appellant's former employer. Dubious, the court told counsel that, if he could get an assurance from the employer in that regard, "then perhaps I'll be more inclined to consider [the request]."

Following a brief recess, the parties returned to the Administrative Judge, and this colloquy occurred:

---

3. Later, before the County Administrative Judge, counsel claimed, again without any detailed support, that "what happened was completely out of character for [appellant] and that the staff at Perkins was indicating and perfunctory, he was not, he was evaluated when he was under medication. He has reservations about not only whether this report is accurate but what evaluations were done...."

"THE COURT: Once again, we're back on 86–Cr–1256 for the postponement request.

What have you been able to ascertain, Mr. Gitomer?

DEFENSE COUNSEL: Your Honor, I contacted the doctor who I would use. He informed me that it would be between a hundred ninety-five to two hundred seventy-five dollars, and I then contacted the T.V. Company, whose name was provided to me by the Defendant, Mr. Lee, and Mr. Lee informed me that neither of them were willing to put up any money, so at this point there is nothing that I can do.

THE COURT: You don't have any money to get a private examination?

DEFENSE COUNSEL: No, I do not.

THE COURT: I am not going to grant the postponement because I don't know if I granted the postponement when he'd be able to get a private examination. There has been a full psychiatric examination done at Clifton T. Perkins. You just have to go with that."

The parties then returned to court for trial, where, as a first order of business, appellant expressly withdrew his plea of "insanity."

Appellant now argues that he had a Constitutional right to seek independent psychiatric assistance, that such assistance "should have been made available at state expense," and that the court's conditioning a postponement on his ability to pay for the independent evaluation constitutes reversible error.

■■■ There are several answers to these assertions. The first is that his alleged Constitutional entitlement to an independent evaluation at State expense was never presented to the trial court and has therefore not been preserved for appellate review. Md. Rule 1085. Second, even if he had such a right, he could have pressed it before the day of trial. He was not entitled to sit back for 16 days, wait until the morning of trial when six witnesses were in court, and then demand a continuance. And third, on the facts of this

case, he was not denied any Constitutional right to psychiatric assistance.

■ The procedure authorized under the Health-General article and employed in this case—evaluation at C.T. Perkins State Hospital—fully satisfied any Constitutional right appellant had to the assistance of psychiatric experts. *Johnson v. State,* 292 Md. 405, 410–16, 439 A.2d 542 (1982). As pointed out by the *Johnson* Court at 414, 439 A.2d 542:

> "Common sense dictates that there be some limit placed upon the right of indigents to the assistance of State-funded experts. This is not a case where the government has refused to provide psychiatric evaluation of a criminal accused who wishes to interpose an insanity defense, or where the resulting report is withheld from the defendant. Nor has appellant in this case produced evidence challenging the professional competence or impartiality of the psychiatrists at the Perkins Hospital. The doctors designated by the Department of Health and Mental Hygiene to examine Johnson are thus 'not partisans of the prosecution, though their fee is paid by the State, any more than is assigned counsel for the defense beholden to the prosecution merely because he is ... compensated by the State.' "

(Footnote omitted.)

Thus, at 415–16, 439 A.2d 542, the Court held:

> "Whatever the amount of required State assistance for the appointment of defense experts to enable the indigent to place the issue of insanity before the trial court, we need not determine here, for it is certain that once an accused is evaluated by state funded, impartial and competent psychiatrists, that constitutional duty, if any, ends. '[T]he State has no constitutional obligation to promote a battle between psychiatristric experts "by supplying defense counsel with funds wherewith to hunt around for other experts who may be willing, as witnesses for the defense, to offer the opinion that the accused is criminally insane".... ' *Swanson v. State,* 9 Md.App. 594, 601–02,

267 A.2d 270, 274 (1970) (Murphy, C.J.). We have found no case which broadens constitutional principles this far and defendant has cited none. Where an indigent accused has already received a competent psychiatric evaluation at state expense, either by the staff of a state institution, or by a private physician selected by the court, the cases throughout the country are in virtual unanimity and agree with our position upholding the denial of the indigent's request for an additional psychiatric expert of his own choosing compensated by the state."

Appellant argues that *Johnson* is no longer valid, that it has been compromised by *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). We do not agree; *Ake* is entirely inapposite.

The sole issue at Ake's trial for murder was his sanity. His pre-trial behavior was sufficiently bizarre that the court *sua sponte* ordered him examined. The examining psychiatrist opined that Ake was a probable paranoid schizophrenic and recommended further inpatient evaluation to determine his competence to stand trial. He was committed to a State hospital for that purpose. The hospital staff agreed with the diagnosis of paranoid schizophrenia and concluded that he was not competent to stand trial. Six weeks later, however, the chief forensic psychiatrist determined that, if Ake continued to receive substantial doses of Thorazine— 200 mg. three times a day—his condition would remain stable, whereupon he was brought to trial.

None of the doctors had evaluated Ake with respect to criminal responsibility and none had ventured an opinion on that issue. Ake, an indigent, asked the court to arrange for a psychiatric evaluation as to his "sanity at the time of the offense," which the court refused to do. He was therefore left with no psychiatric opinion on that critical issue and, under Oklahoma law, the burden of producing evidence as to his insanity. The jury was instructed that Ake was presumed sane unless he presented evidence sufficient to raise a reasonable doubt in their minds as to his sanity. It convicted.

Presented with those facts, and the further fact that, based in part of the State psychiatrist's uncontradicted conclusion that Ake was dangerous, a death sentence was imposed, the Supreme Court stated at 470 U.S. 83, 105 S.Ct. at 1097:

"We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. *This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right.*"

(Emphasis added.)

*Ake* does not overrule *Johnson;* indeed, it supports *Johnson.* The State has fully complied with the requirements of *Ake;* it has afforded appellant access to a battery of competent experts who have conducted an appropriate examination. The results were not to his liking, but we do not read *Ake* as mandating a *favorable* opinion, only the opportunity to obtain a competent and impartial one.[4]

## (2) *Admission of Documents*

About four hours after the shooting, appellant was found by a police officer slumped over the steering wheel of his car. The doors were locked, the engine was running, and

---

4. For purposes of this case, we shall accept appellant's assertion that, despite being represented by private counsel (or perhaps because of it), he did not have the $195–$275 counsel claimed it would cost for a psychiatric evaluation. Whether a defendant who can afford to retain private counsel should nonetheless be regarded as an indigent and declared entitled to the State-paid services available to indigents is an issue we do not decide here.

appellant failed to respond to the officer's attempts to waken him. Finally gaining entrance, the officer observed appellant in convulsions and called for medical assistance. While attempting to assist appellant, the officer looked around the interior of the car and noticed some .22 caliber bullets and some papers with handwriting on them. Four of those papers were admitted into evidence; that forms the basis of appellant's second complaint.

One item appears to be a bank passbook envelope. On the inside is some handwriting that the victim stated "looks very much like Djoudi's." She said that she had seen his handwriting before and the writing on the envelope "looks very close to it...." The other three items were cards sent to appellant by the victim. On one, a birthday card, the victim identified the handwriting inside as her own. Another card had a love poem printed on it. On the back is some handwriting, partly in ink and partly in pencil. The inked writing, the victim stated was hers. The other writing, which included some dates, the victim said she could not positively identify—"[s]ome of it looks like it's Djoudi's, but I'm just not familiar with his numbers, or whatever." The third card had some handwriting in red ink, which the victim identified as her own, and some scrawled writing in black ink, which the victim said "is shaky, it looks like Djoudi's."

Appellant does not contest the relevance of the writing on the cards; it supports the notion of a love affair gone sour and a resulting despondency on appellant's part. On one of the cards were the handwritten words, "I killed her because of the hurt." Appellant contends only that the writing on the cards represents hearsay evidence that was not properly authenticated as being his writing. We disagree. The cards (though apparently not the passbook envelope) were sent to him by the victim; they were found in his car in close proximity to him; the handwritten words are responsive to the written message on the cards and were identified by the victim as being either her own or

what appeared to her to be appellant's. We think that constitutes sufficient authentication.

JUDGMENTS FOR ATTEMPTED MURDER AND USE OF HANDGUN AFFIRMED; CONVICTION FOR MALICIOUS DESTRUCTION OF PROPERTY AFFIRMED BUT CASE REMANDED ON THAT CONVICTION TO CIRCUIT COURT FOR BALTIMORE COUNTY FOR RESENTENCING; COSTS TO BE PAID THREE–FOURTHS BY APPELLANT, ONE–FOURTH BY BALTIMORE COUNTY.