Glen Burton AKE, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–86–579.

Court of Criminal Appeals of Oklahoma.

July 13, 1989.

Irvin R. Box, Diane Clowdus, Oklahoma City, for appellant.

Robert H. Henry, Atty. Gen., Susan Stewart Dickerson, Asst. Atty. Gen., Deputy Chief, Criminal Div., Oklahoma City, for appellee.

## OPINION

PARKS, Presiding Judge:

Appellant, Glen Burton Ake, was tried by jury and convicted of two counts of First Degree Murder (21 O.S.1981, § 701.7) and two counts of Shooting with Intent to Kill (21 O.S.1981, § 652), in Canadian County District Court, Case Nos. CRF–79–302, CRF–79–303, CRF–79–304 and CRF–79–305, before the Honorable Joe Cannon, District Judge. The jury set punishment during the second stage at life imprisonment for each count of First Degree Murder and

two hundred (200) years imprisonment for each count of Shooting with Intent to Kill. Judgment and sentence was imposed accordingly. We affirm.

Appellant was first convicted of these crimes in 1980. He filed a direct appeal and his convictions were affirmed. *Ake v. State*, 663 P.2d 1 (Okla.Crim.App.1983). However, the United States Supreme Court, in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), reversed and remanded for a new trial. Appellant now appeals the convictions of this second trial.

The facts leading to these events began on October 15, 1979, while appellant and his co-defendant, Steven Hatch, were employed at a drilling company. Early that morning, Claude Lucas drove appellant and Hatch to work. On the way, the three stopped so appellant could do some target practice. After arriving at work, appellant and Hatch quit their jobs and borrowed Lucas' car, telling him they would return it later that afternoon. During the evening, appellant and Hatch drove to the rural home of the Richard Douglass family. Hearing the dogs bark, Leslie, the twelve-year old daughter, went to the front yard and asked appellant if he needed help. He asked for an address and she went inside to look it up in the telephone book. Appellant and Hatch entered the house under the pretext of using the phone, and after gaining entrance, both men pulled guns and told the family they would "blow their heads off" if they tried anything.

Richard and Marilyn Douglass, who were in various parts of the house, were forced into the living room, as was Brooks, their son. Marilyn and Brooks were led to their rooms to retrieve any money they had. They were returned to the living room, where all but Leslie were bound, gagged and told to lay face down on the floor. Leslie was then forced to show appellant and Hatch the "secret hiding places" of the family. Appellant tore the phones from their connections. He then demanded Leslie undress, and he and Hatch attempted to rape her. Appellant tried unsuccessfully a second time to rape her. After these at-tempts, she was told to dress and return to the living room, where she was bound, gagged and forced to lay face down on the floor. Hatch then covered the heads of all four of the Douglass family. Appellant sent Hatch to the car and told the family he didn't want to shoot them, but he didn't know if they could be trusted. After saying, "I'm sorry but dead men don't talk," he shot Brooks once, Marilyn once, Richard twice and Leslie twice and fled from the house.

The two children were able to untie themselves and drive to the house of a nearby doctor. The sheriff's office was summoned and upon arrival at the Douglass home, Marilyn and Richard Douglass were dead. A palm print of appellant was found in the house and the bullets recovered from the Douglass home were identical to those found at the site where appellant practiced shooting earlier in the day. In November, appellant and Hatch were arrested in Craig, Colorado. Hatch was wearing the wedding ring of Richard Douglass. Appellant was using a Visa credit card belonging to Marilyn Douglass. Mrs. Douglass' wedding ring was also recovered.

Before the second trial, defense counsel filed a motion asking that appellant be sent for testing regarding his competency to stand trial. Initially, after arriving at Eastern State Hospital, appellant was found to be incompetent. However, some months later, the attending doctors informed the court that appellant was competent to stand trial as long as he remained on his medication, which consisted of 1600 milligrams of Thorazine. A hearing was held to determine appellant's competency. The jury unanimously found appellant to be competent to stand trial.

At trial, appellant's sole defense was that of insanity at the time of the offense. Prior to trial, appellant requested that the trial court provide him access to a psychiatrist in order to prepare his defense. The court granted his request, and defense counsel contacted Dr. Hans Von Brauchitsch, who testified on behalf of appellant. Dr. Von Brauchitsch testified that

appellant was very agitated and upset a few days prior to October 15, 1979. Appellant related to the doctor that he quit his job because of the "enemies" that were after him. When appellant left work that morning, he thought his imaginary enemies were trying to trap him. Dr. Von Brauchitsch stated that the voices in appellant's head directed him to the Douglass house and forced him to shoot them.

Dr. Von Brauchitsch also explained that appellant was suffering from paranoid schizophrenia. He stated that while the disease itself could not be cured, the symptoms of the disease could be treated with medication. However, when taken off the medications prescribed to treat the illness, appellant lapses back into a delusional state, or what appellant terms "the demon world." The doctor explained that appellant's condition had deteriorated over the past several years, and that appellant had been schizophrenic since between 1973 and 1975. When asked whether appellant could distinguish right from wrong on the day that the crimes were committed, Dr. Von Brauchitsch stated that appellant did not know right from wrong.

■ As his first assignment of error, appellant alleges a violation of his right to a speedy trial due to the six year delay between his first trial and his second trial. Appellant was first tried and convicted in 1980, and the convictions were subsequently overturned by the United States Supreme Court in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). The State then began proceedings to retry appellant, but during the course of said proceedings, delays occurred due to appellant's mental condition. The second trial was held in February, 1986.

To determine whether a violation of the constitutional right to a speedy trial has occurred, this Court has consistently adhered to the test set forth in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), which requires consideration of the length of delay, the reasons for the delay, the party's assertion of his or her right to a speedy trial, and the degree of prejudice suffered by the party. *See*

*Johnson v. State*, 761 P.2d 484, 487 (Okla. Crim.App.1988); *Henderson v. State*, 743 P.2d 1092, 1094 (Okla.Crim.App.1987).

The length of delay between the crime and appellant's second trial was approximately six years. Clearly, this delay necessitates an inquiry into the remaining factors. *See Johnson*, 761 P.2d at 487. There were several reasons for the long delay. Initially, we note that the State did not delay in bringing appellant to trial, as his first trial was held in 1980 and his second trial was held within one year of the United States Supreme Court's reversal. Clearly, appellant cannot complain of the delay between trials as *United States v. Ewell*, 383 U.S. 116, 121, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966), held that a defendant who obtains reversal of his conviction may be retried notwithstanding the delay incident to such legal proceedings. It is the delay between the Supreme Court's decision and appellant's retrial that concerns this Court. However, the record reveals that such delay was due largely to appellant's mental condition. Appellant was hospitalized several times to undergo testing to evaluate his competency.

The next factor to be considered by this Court is appellant's assertion of his right to a speedy trial. A motion to dismiss for lack of a speedy trial was filed by defense counsel on December 12, 1985, which was two (2) months before trial.

The last factor is the degree of prejudice suffered by appellant. Appellant urges that the long delay between the two trials prejudiced his defense because of his deteriorating mental condition. However, we find no prejudice especially in light of the fact that appellant was found competent and was able to function mentally due to medication prescribed for his illness. Appellant was able to present the defense of insanity at trial, and said defense was not hampered by the delay. Accordingly, this assignment is without merit.

Appellant also asserts that he was incompetent to stand trial. As the basis for this argument, appellant urges that "his chronic progressive mental disease" precluded him from being competent at the time of

trial, and because his condition continues to deteriorate, appellant asserts he can never stand trial. In rebuttal the State points out that appellant was given a competency hearing, wherein both parties presented evidence regarding appellant's competence. The jury determined appellant was competent to stand trial.

■ Title 22 O.S.1981, § 1175.4(B) presumes the defendant is competent and requires him to prove his incompetence by clear and convincing evidence. *Miller v. State,* 751 P.2d 733, 737 (Okla.Crim.App. 1988). The test used to determine appellant's competency is whether the accused has sufficient ability to consult with his lawyer and has a rational as well as actual understanding of the proceedings against him. *Beck v. State,* 626 P.2d 327, 328 (Okla.Crim.App.1981).

■ In the present case, appellant called four witnesses at the post-examination competency hearing, three of these witnesses being psychiatrists. All three doctors testified he was competent, although two expressed their opinion that appellant was suffering from chronic paranoid schizophrenia. The doctors testified that appellant realized the nature and consequences of his crime and understood the importance of defense counsel and realized he needed to cooperate with his attorneys. The record also reveals that appellant understood the duties of the judge, jury and attorneys. Accordingly, appellant failed to meet his burden of proof. *See Fox v. State,* 524 P.2d 60, 65–66 (Okla.Crim.App. 1974). This assignment is without merit.

■ Next, appellant argues that the trial court committed constitutional error by refusing to appoint a psychiatrist to assist and aid him in his post-examination competency hearing. As support for his assertion, appellant relies on *Ake v. Oklahoma,* 470 U.S. at 83, 105 S.Ct. at 1096, which states as follows:

We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own.

Before the post-examination competency hearing, appellant filed a written request for the appointment of a psychiatrist to aid him in preparing for the hearing. The State opposed such motion, stating that *Ake* was limited to the provision of a psychiatrist at trial to aid in an insanity defense. In the alternative, the State asserted that the mandates of *Ake* had been met because appellant had been given access to a competent psychiatrist. The district court denied appellant's request, although the basis of the ruling is not contained in the record.

This Court has yet to to determine whether the rationale of *Ake* extends to the provision of a psychiatrist for the purposes of a competency hearing.[1] However, assuming arguendo that *Ake* requires an indi-

---

1. It is this writer's opinion that the ruling in *Ake* must necessarily be extended to include any expert which is "necessary for an adequate defense." *See* 18 U.S.C.A. § 3006A(e). This view is consistent with the view held in at least forty other states, as those states, either by legislative enactment or judicial decision, have acknowledged that any expert "necessary for an adequate defense" will be provided once the defendant makes the requisite showing. *See Ake v. Oklahoma,* 470 U.S. at 79 n. 4, 105 S.Ct. at 1094 n. 4. *See also State v. Martinez,* 734 P.2d 126 (Colo.Ct.App.1986) (polygraph examiner); *Estes v. State,* 725 P.2d 135 (Idaho 1986) (investigator and technical analysis expert); *State v. Haislip,*

237 Kan. 461, 701 P.2d 909 (1985), *cert. denied,* 474 U.S. 1022, 106 S.Ct. 575, 88 L.Ed.2d 558 (1985) (hypnosis expert); *State v. Tison,* 129 Ariz. 526, 633 P.2d 335 (1981) (survey analysis expert). This view is also consistent with current federal statutes. *See* 18 U.S.C.A. § 3006A(e); *United States v. Moss,* 544 F.2d 954 (8th Cir.1976), *cert. denied,* 429 U.S. 1077, 97 S.Ct. 822, 50 L.Ed.2d 797 (1977) (optometrist); *United States v. Sanders,* 459 F.2d 1001 (9th Cir.1972) (physician); *United States v. Bledsoe,* 674 F.2d 647 (8th Cir.1982), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982) (business consultant); *United States v. Barger,* 672 F.2d 772 (9th Cir.1982) (investigator).

gent defendant be provided access to a competent psychiatrist for his competency hearing if the requisite showing is made, we believe that appellant's due process rights were not violated insofar as he had access to several competent psychiatrists before the hearing.

"[A]ccess to a competent psychiatrist who will conduct an appropriate examination" does not constitutionally mandate that appellant be given the "right to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Ake*, 470 U.S. at 83, 105 S.Ct. at 1096; *Brown v. State*, 743 P.2d 133, 137 (Okla.Crim.App. 1987). "[T]he State has no constitutional obligation to promote a battle between psychiatric experts 'by supplying defense counsel with funds wherewith to hunt around for other experts who may be willing, as witnesses for the defense, to offer the opinion that the accused'" wishes to place before the jury. *Djadi v. State*, 528 A.2d 502, 505 (Md.App.1987), (quoting *Swanson v. State*, 9 Md.App. 594, 267 A.2d 270, 274 (1970)).

Appellant argues that he "was forced to proceed ... without the benefit of an independent psychiatric examination to aid in meeting the burden of proof as to defendant's incompetency" as he had "no expert testimony to support his contentions." *Brief of Appellant*, at 23. This argument is flawed for two reasons. First, appellant was examined by three competent psychiatrists. All three conducted examinations regarding his competency and determined he was competent to stand trial. Although two of the doctors were employed by a state mental hospital, one doctor was an "independent" psychiatrist as he was employed by a private, non-profit community mental health center.[2] Second, "we do not read *Ake* as mandating a favorable opinion,

only the opportunity to obtain a competent and impartial one." (Emphasis in original) *Djadi*, 528 A.2d at 506. As we stated in *Brown*, "an indigent defendant is not entitled to public funds to 'shop around' until he finds a 'hired gun' with a favorable opinion." 743 P.2d at 137. *See also De-Bolt v. State*, 604 S.W.2d 164, 165–66 (Tex. Crim.App.1980); *Pruett v. State*, 287 Ark. 124, 697 S.W.2d 872, 876 (1985); *Bradford v. State*, 512 So.2d 134, 135 (Ala.Crim.App. 1987). Thus, contrary to appellant's assertion, due process does not entitle appellant to a state-funded psychiatric expert to support his claim; rather, due process requires that he have access to a competent and impartial psychiatrist. *Ake*, 470 U.S. at 83, 105 S.Ct. at 1096. Because this requirement was met, this assignment is without merit.

As his next assignment of error, appellant claims that the trial court erred by denying his request for a continuance. Appellant states that a continuance was necessary to allow the defense psychiatrist to examine appellant while he was not under the influence of medication. In his motion filed with the district court, appellant explained that it would take two weeks to remove appellant from all medication and would take approximately three weeks to restore his medication to full dosage.

 The grant or denial of a continuance is within the discretion of the trial court and absent an abuse of discretion, this Court will not disturb the trial court's ruling. *Walker v. State*, 723 P.2d 273, 279 (Okla.Crim.App.1986), *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986). In *Walker*, the defendant asked for a continuance in order to allow the defense psychiatrist sufficient time to review medical records. The continuance was refused

---

**2.** This Court does not interpret *Ake* to mandate an "independent" psychiatrist in the sense that appellant is allowed to choose the psychiatrist. Instead, *Ake* requires that if an examination is necessary, it shall be conducted by a competent and impartial psychiatrist. In his brief, appellant implies that because all three doctors were compensated with state funds, their opinions were biased. *Brief of Appellant*, at 23. However, after scrutinizing the transcripts and record, there is no indication of bias. As stated

in *Djadi v. State*, 528 P.2d at 505, state-funded psychiatrists are "not partisans of the prosecution though their fee is paid by the State, any more than is assigned counsel for defense beholden to the prosecution merely because he is ... compensated by the State.... [I]t is certain that once an accused is evaluated by state funded, impartial and competent psychiatrists, that constitutional duty, if any, ends...." In the present case, appellant had access to three competent psychiatrists.

by the trial court, and this Court upheld the ruling below, pointing out that the doctor's testimony indicated he had sufficient time to review medical records. Similarly, in the present case, Dr. Von Brauchitsch was asked repeatedly what difficulties he faced in diagnosing appellant. Although he explained many of the problems he encountered, the doctor never mentioned that his examination was hindered by the fact that appellant was on medication. Furthermore, Dr. Von Brauchitsch testified he was able to make a diagnosis and was confident in his diagnosis. In light of these facts, we cannot say the trial court abused its discretion in denying the continuance. *See Walker*, 723 P.2d at 280.

■ Next, appellant claims he should not have been shackled during his trial. Before trial, the judge questioned defense counsel as to whether appellant should remain shackled during trial to protect others in the courtroom. Defense counsel agreed that appellant should remain shackled, but asked that precautions be taken to ensure that the shackles were not viewed by the jurors. Defense counsel concedes that no juror reported seeing the leg shackles.

In *Davis v. State*, 709 P.2d 207, 209 (Okla.Crim.App.1985), this Court reiterated the rule that no defendant shall be tried in handcuffs or shackles unless he waives his right. However, in the present case, appellant affirmatively waived his right to be free of shackles. We also note that, on all occasions, appellant was brought into the courtroom before the jury and taken out after the jury had been removed. Defense table was covered by a cloth to prevent the jury from viewing the shackles. Thus, we find no error.

Appellant also claims that the fact he was shackled during trial indicates he was incompetent. However, as we determined above, sufficient evidence existed to support the jury's determination of competency. This assignment is without merit.

As his next proposition, appellant urges that error occurred when the trial court refused to allow inquiry into the beliefs of prospective jurors regarding the possibility of determining an accused's mental condi-

tion many years after the crime. Appellant argues that such inquiry was necessary to determine "prejudice in jurors who did not believe such retrospective diagnoses could be accomplished." *Brief of Appellant*, at 35.

■ The manner and extent of examination of prospective jurors rests largely in the sound discretion of the trial court and, absent a clear abuse of discretion, the trial court's ruling will not be disturbed. *Brogie v. State*, 695 P.2d 538, 544 (Okla.Crim. App.1985). "The purpose of voir dire examination is to ascertain whether there are grounds to challenge for either actual or implied bias and to permit the intelligent exercise of peremptory challenges." *Jones v. State*, 508 P.2d 280, 282 (Okla.Crim.App. 1973). Because there is no "definite, unyielding rule" regarding the extent of voir dire examination, "there is no abuse of discretion so long as the voir dire questioning is broad enough to afford the appellant a jury free of outside influence, bias or personal interest." *Manning v. State*, 630 P.2d 327, 329 (Okla.Crim.App.1981).

In the present case, an exhaustive voir dire was conducted. It occurred over a period of three days and included more than seven hundred (700) pages of transcript. The trial court was lenient in the scope and extent of examination, and we have no doubt the attorneys were able to make intelligent choices as to their challenges. When appellant attempted to question prospective jurors regarding their opinions as to the possibility of diagnosing an accused's mental condition many years after the crime, the following exchange occurred:

MR. BOX: We would like to be able to ask them if they would consider that testimony even though the examination was made some seven years after the commission [of the offense.]

THE COURT: I'll let you ask them will they consider all of his testimony and give it full weight and credit that they deem it's entitled to, but I'm not going to let you specifically ask them—that would be like asking him if this guy testifies that the sky is purple all day everyday

will you believe it or not. You can't do that. I'm not going to let you specifically say if a witness will testify to such will you consider it, but you can ask will they believe—

MR. BOX: May I ask him if he believes—may I ask him if he believes it's possible for a psychiatrist to make diagnosis seven years after the commission of a crime?

THE COURT: No, that's what I'm saying I'm not going to let you do. I'll let you ask will you listen to the psychiatrist and all of his testimony and give it what weight and credit, will you listen and judge it and not judge it in advance, but I'm not going to let you specifically pinpoint things, will you believe this, will you believe that, will you consider this. Consider it all. You can argue that in your closing argument but not now. Objection sustained.

■■■ Clearly, defense counsel was asking questions regarding the credibility of an expert witness. The trial judge was correct in his analysis that credibility is an issue to be argued in closing statements as it is a question of fact for the jury and is not relevant during voir dire proceedings. *See Curtis v. State,* 762 P.2d 981, 983 (Okla.Crim.App.1988). Hence, the trial court did not abuse its discretion in refusing to allow this particular line of questioning during voir dire examination.

Next, appellant submits that reversible error occurred when the trial court refused to allow Dr. Von Brauchitsch to state the diagnoses of other physicians which were relied upon by him in reaching his opinion regarding appellant's sanity at the time of the crime. The State argues "that the diagnoses of the other professionals constituted hearsay and, as such, [were] properly excluded from evidence."

■■■ The State's argument is incorrect because 12 O.S.1981, §§ 2703 and 2705 allow for the admission of facts and data which are not otherwise admissible so long

as certain requirements and guidelines are followed:

§ 2703. Bases of Opinion Testimony by Experts

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made know to him at or before the hearing. *If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.*

§ 2705. Disclosure of Facts or Data Underlying Expert Opinion

*The expert may testify* in terms of opinion or inference and give his reasons therefor *without prior disclosure of the underlying facts or data,* unless the court requires otherwise. *The expert may be required to disclose the underlying facts or data on cross-examination.* (Emphasis added)

Sections 2703 and 2705, which are identical to Sections 703 and 705 of the Federal Rules of Evidence, broadened the scope of permissible expert opinions. It is no longer required that all data relied on by the expert be admissible into evidence, "so long as it is 'of a type reasonably relied on by experts in the particular field in forming opinions or inferences upon the subject.'" *United States v. Lawson,* 653 F.2d 299, 302 (7th Cir.1981), *cert. denied,* 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 (1982). However, the admission of such evidence is within the discretion of the trial court and if admitted, should be accompanied by a limiting jury instruction to clarify that the evidence can only be used to evaluate the credibility of the testifying expert's opinion. *See* 1 L.Whinery, *Guide to the Oklahoma Evidence Code,* 245, 255 (1985).

■■■ In the case at bar, the defense expert attempted to relate to the jury the diagnoses of other professionals which he relied on in forming his opinion.[3] The prosecutor objected, and a conference was held

---

**3.** Although Dr. Von Brauchitsch never stated that the reports and tests made by other doctors was "of the type reasonably relied upon," as is required by Section 2703, this Court may take judicial notice that psychiatrists customarily use such information to make a diagnosis. *See Lawson,* 653 F.2d at 302 (n. 7).

at the bench. At the conclusion of this conference, defense counsel agreed that the actual diagnoses of these other professionals were not admissible and the trial judge ruled that such evidence was not properly elicited through the testimony of Dr. Von Brauchitsch. The judge made it clear that the other doctors had been subpoenaed and could be called to testify as to their diagnoses. Later, during the redirect examination of Dr. Von Brauchitsch, the problem arose again. In response to a question by defense counsel, Dr. Von Brauchitsch testified that appellant had been diagnosed by another psychiatrist as mentally ill in 1980, and that the mental illness had existed for at least six months prior to the diagnosis. When asked which doctor reached this diagnosis, the prosecutor objected. The trial judge again addressed the question and explained that his main concern was the inability to cross-examine these other doctors as to their opinions.

Although the admission of facts or data relied upon by the expert is permissible under Section 2703 and 2705, the admission of such evidence remains within the sound discretion of the trial court. *See* Whinery, *supra,* at 245, 255; *Scott v. State,* 751 P.2d 758, 760 (Okla.Crim.App.1988); *Clark v. State,* 95 Okla.Cr. 119, 239 P.2d 797, 800 (1952). In *State v. Furman,* 158 Mich.App. 302, 404 N.W.2d 246 (1987), the Michigan Court of Appeals dealt with a similar issue. The defendant, charged with first degree murder, asserted the defense of insanity. During trial, the defendant moved to admit a videotaped interview of the defendant by the defense expert psychiatrist. He argued that the videotape should be admitted to show the underlying facts and data relied upon by the psychiatrist. The trial court denied its admission, ruling that the tape would allow the defendant to testify without being subject to oath or cross-examination. On appeal, the trial judge's ruling was upheld "since the defense expert was able to testify about the factual and professional bases of his opinion," thereby diminishing the probative value of the video. *Id.* 404 N.W.2d at 257.

Likewise, in the instant case, defendant sought to admit, through the testimony of Dr. Von Brauchitsch, the diagnoses of other doctors. He claimed that the diagnoses were admissible as "underlying facts and data" relied upon by Dr. Von Brauchitsch. The trial judge refused to allow such testimony, stating that if the defendant wanted to place that testimony before the jury, it would be necessary to call the doctors as witnesses in order to allow cross-examination. Also important is the fact that, during redirect examination, defense counsel was able to elicit the fact that appellant had been repeatedly diagnosed as mentally ill.

Appellant urges that the diagnoses of the other doctors would have boosted the credibility of Dr. Von Brauchitsch, although it could not be used for substantive evidence. *See State v. Edwards,* 63 N.C. App. 737, 306 S.E.2d 160, 161 (1983). However, because the defense psychiatrist was able to testify regarding all tests, reports, and records made by the other doctors, and because he testified that appellant had been diagnosed as mentally ill in 1980, we believe the probative value of such evidence is diminished. While appellant claims the evidence was crucial, we do not agree insofar as appellant could have called these various doctors to testify regarding their diagnoses and opinions. *See United States v. Fountain,* 840 F.2d 509, 517 (7th Cir.1987). Thus, we cannot say that the trial court abused its discretion in refusing this evidence. *See United States v. Dyer,* 752 F.2d 591, 593 (11th Cir.1985) (trial court held inadmissible the opinion of a doctor although it was relied upon by the testifying expert).

■ As his next assertion, appellant claims that his confession should have been suppressed as it was in violation of his sixth amendment right to counsel. As support for his claims, appellant primarily relies on *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), and *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). The State refutes appellant's argument by pointing out that appellant initiated the conversation and waived his right to counsel.

In the present case, the record reveals that, prior to his arraignment, appellant indicated to Officers Stedman and Shields that he wished to talk to them about the Douglass case, but that he would prefer to wait. Appellant was arraigned on March 23, 1980, and counsel was appointed. Later that afternoon, appellant contacted Officer Stedman and asked for cigarettes. Around 9:00 p.m. that same day, appellant asked to speak with Officer Stedman about the Douglass case because "he had some things on his mind he wanted to get off his chest." (Tr. 1153) Officers Stedman and Shields were notified of appellant's request, and went to the county jail where appellant was being held. The transcribed conversation reveals that appellant was aware the conversation was being taped. He was informed of his rights, and told the officers he wanted to talk with them. The officers then asked him to tell them what happened on October 15, 1979. Appellant narrated the events leading up to the episode at the Douglass home, explained his involvement in the murders, and continued by revealing the events following the murders. During this time, the officers asked only one question. After appellant had finished his story, the officers then asked questions regarding the information he had given them. The discussion lasted for approximately one hour and forty-five minutes.

With this factual background, we turn to the authority cited by appellant. In *Maine v. Moulton*, 474 U.S. at 177, 106 S.Ct. at 488, the United States Supreme Court held that a defendant's sixth amendment right to counsel was violated when an undercover informant, also a co-defendant, recorded conversations between himself and the defendant at the request of police. "By concealing the fact that Colson was an agent of the State, the police denied Moulton the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment." *Id.* In reaching this decision, the Court emphasized the "undercover" investigatory techniques employed by the police and the relationship between the informant and the defendant. *See Kuhlmann v. Wilson*, 477

U.S. 436, 459, 106 S.Ct. 2616, 2629–30, 91 L.Ed.2d 364 (1986).

After close examination, we do not believe the holding in *Moulton* is determinative of the present case. The reasoning in *Moulton* is inapplicable insofar as the instant case does not involve a police agent whose identity was concealed from appellant. Instead, appellant knew that Officers Stedman and Shields were law enforcement officials. Furthermore, unlike *Moulton* wherein the defendant was not given the opportunity to ask for counsel before the "interrogation" began, appellant had the opportunity to speak with counsel, but instead, summoned the officers and told them he had some things "he wanted to get off his chest." Thus, while some of the broad language in *Moulton* supports appellant's theory, the rationale and ruling of the case is not dispositive.

Appellant also relies on *Michigan v. Jackson*, 475 U.S. at 636, 106 S.Ct. at 1411, for the proposition "any resumption of interrogation after a suspect asserts his right to counsel" is proscribed "unless it is the suspect, not the police who first initiate the contact." *Brief of Appellant*, at 44. While we agree with appellant's interpretation of *Jackson*, we must point out the fatal flaw in appellant's reasoning. *Jackson* proscribes "police initiate[d] interrogation after a defendant's assertion ... of his right to counsel." *Id.* In the instant case, appellant initiated the conversation by asking to speak with the officers. The police did not initiate any conversation with appellant after his arraignment and there is no indication the officers were attempting to circumvent appellant's right to counsel. Accordingly, *Jackson* is not determinative of this issue.

We next consider whether appellant waived his right to counsel during the conversation with Officers Stedman and Shields. As a general rule, a defendant can waive his right to counsel after counsel has been appointed and consent to questioning. *Reid v. State*, 478 P.2d 988, 999 (Okla.Crim.App.1971), modified on other grounds, *Pate v. State*, 507 P.2d 915 (Okla. Crim.App.1973). Although *Moulton* and

*Jackson* are exceptions to this general rule of waiver, the rule remains intact insofar as we have determined that these exceptions are not applicable in the present case. In order to waive his right to counsel, a defendant must voluntarily and intelligently relinquish a known right or privilege. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981).

■ Similar to the case at bar is *Curliss v. State*, 692 P.2d 559 (Okla.Crim.App. 1984), wherein the defendant asserted he was denied assistance of counsel. Although this Court agreed that the defendant's right to counsel had attached, we held that the defendant had waived this right. An *in camera* hearing revealed that appellant was advised of his rights, indicated he understood those rights, and was asked if he wanted his attorney present to which he replied in the negative. Under these circumstances, we determined the defendant had waived his right to counsel during the questioning. Likewise, in the present case, appellant initiated the contact with police officers, told them he wanted to discuss the Douglass case, was advised of his constitutional rights and indicated he understood his rights. He was then asked "having these rights in mind do you wish to talk with us now?" to which appellant responded "yes, sir." Accordingly, we find that appellant waived his right to have counsel present during the interview. This assignment is without merit.

■ Finally, in his last assignment of error, appellant claims the State's burden of proof was improperly shifted by the instructions given regarding sanity. Specifically, he argues the State was relieved of proving the requisite intent because the jury was instructed that the law presumed him to be sane. Although this Court recently resolved this issue in *Brewer v. State*, 718 P.2d 354 (Okla.Crim.App.1986), *cert. denied*, 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 169 (1986), appellant urges us to reconsider our holding regarding the validity of *Oklahoma Uniform Jury Instruction—Criminal* (OUJI–CR) No. 730 (1981).

The rule that "every man is to be presumed to be sane" has endured for over a century. *Leland v. Oregon*, 343 U.S. 790, 796, 72 S.Ct. 1002, 1006, 96 L.E. 1302 (1952). We see no reason to depart from this rule. In *Brewer*, this Court, approving the rebuttable presumption of sanity, explained that *Oklahoma Uniform Jury Instruction—Criminal* (OUJI–CR) No. 730 (1981) was an incorrect statement of law as it deprived the State of a presumption which was legally correct.

The purpose of jury instructions is to place before the jury a correct and full statement of the law which is applicable to the case. *See Rounds v. State*, 679 P.2d 283, 288 (Okla.Crim.App.1984). Hence, a complete statement of the law requires the jury be informed of the rebuttable presumption of sanity. We therefore affirm our ruling in *Brewer*. *See Morris v. State*, 766 P.2d 1388, 1390 (Okla.Crim.App.1988). This assignment is without merit.

For the reasons mentioned above, the judgment and sentence is AFFIRMED.

LANE, V.P.J., and BUSSEY and LUMPKIN, JJ., concur.

BRETT, J., specially concurs.

BRETT, Judge, specially concurring.

While I concur in this decision, I do not subscribe to the author's comments in footnote I. Each case must be considered on its own merits as to the extent of technical assistance that should be allowed.